BROWN (HOGAN v.). See Case No. 6,581.

## Case No. 2,013.

### BROWN et al. v. HUGER.

[1 Quart. Law J. 55.]

District Court, W. D. Virginia. Oct. Term, 1854.

BOUNDARIES— COURSE AND DISTANCE —. CONTROL BY MONUMENTS—EVIDENCE.

1. It is a fundamental principle in the law of boundary, that course and distance must yield to a natural or artificial monument.

2. If there are two calls in a patent, one for a magnetic line of a given course and distance, and the other for a permanent, sensible object, as the terminus of a line and the two calls conflict, the magnetic line must be abandoned and the known monument must be reached by a line conducting to it, however variant it be from the magnetic line called for.

3. The court is not restricted, in deciding a question of boundary, to the patent itself, but may refer to the original entry, survey and plat, which preceded its emanation.

[See Stein v. Bowman, 13 Pet. (38 U. S.) 209.]

[At law. Action of ejectment by Jacob B. Brown and others against Benjamin Huger. Verdict for defendant.]

A. H. H. Stuart and Thomas J. Michie, for plaintiffs.

James M. Mason and F. Miller, for defendant.

BROCKENBROUGH, District Judge. This is an action of ejectment brought by the plaintiffs against Benjamin Huger, to recover a tract of land containing 39½ acres, situated at the confluence of the Shenandoah and Potowmac rivers. Their claim is founded on a patent issued to them by the state of Virginia, bearing date July 29th, 1851. The patent conveys to them the said tract of land, which is described as being bounded by each of the said rivers and the meanders thereof, and by certain artificial lines laid down in a plat of survey which is in evidence before the jury. The defendant, late superintendent of the armory and arsenal of the United States at Harper's Ferry, deduces the title of the United States, through various mesne conveyances, from a patent issued by Thomas Lord Fairfax to Robert Harper, dated 25th April, 1751, conveying a tract of land, by metes and bounds, containing 125 acres, lying at the mouth of the Shenandoah river, and insists that the patent under ·which he claims, on behalf of the United States, comprehends within its boundaries the whole of the land specified in the plaintiffs' patent. The evidence on both sides having been concluded, the defendant's counsel moved the court to give the following instruction, viz.: "That the patent to Robert Harper, having its beginning corner on the Shenandoah river, and calling to extend thence down the river, by course and distance, to the point where it appears from the survey made in this cause the river Shenandoah unites with the Potowmac, and from that point up the river Potowmac by course and distance, to a corner near the last named river, opposite to a small island, in construction of law, the two rivers are thereby made the boundaries of said patent, from said beginning on the Shenandoah to the last named corner on the Potowmac; and that if the jury believe, from the evidence in the cause, that the land claimed by the plaintiffs lay along the rivers Shenandoah and Potowmac, within the lines of the patent to Robert Harper, extended as aforesaid to the two rivers, they must find for the defendant, the patent under which the plaintiffs claim being junior to that of Harper, under which the defendant claims, unless the plaintiffs should establish a title to the land, in controversy, other than through their patent aforesaid." This instruction refers to the court the construction of the Harper patent, under which the defendant claims. The question, what are the boundaries of that patent? is certainly a legal question, which it is the province of the court to determine. It is a question of the construction of a written instrument, and in its solution the court may avail itself of all the lights which any other document connected with the patent, or referring to the same subject matter, may throw upon it. The court is not restricted, then, to the patent itself, in determining its construction, but may refer to the original entry, survey and plat which preceded its emanation. This is established

by the cases cited at the bar, and is sanctioned by the court of appeals of Virginia in the recent case of French v. Bankhead, 11 Grat. 136. Are the two rivers, Shenandoah and Potowmac, then, the true boundaries of the Harper patent? Or, is it bounded by the right lines, A B, B C, C G, or C 18? If the former, the patent comprehends all the lands covered by the plaintiffs' patent; if by the latter, the plaintiffs' patent confers upon them a valid title to all the lands between those right lines and the rivers, respectively, unless the commonwealth had previously her title by reason of the adverse possession of the defendant and those under whom he claims. The court is, therefore, to decide a question which lies at the foundation of the plaintiffs' title, and in the consideration of it, I have bestowed upon it the most mature deliberation which circumstances allowed, both during the progress of the able and interesting argument at the bar, and since its close yesterday.

The first call of the office copy of the Harper patent, which was read in evidence by the defendant, is clearly erroneous. The call is to run down the Shenandoah from a sycamore on the edge of the river, N. 48 W. two hundred poles. Such a line would run up the river. The defendant, having shown the loss of the original patent, and having thus laid a sufficient foundation to let in parol evidence of its contents, has clearly shown the error of the copy of the patent offered in evidence by him. It was shown that the original patent was in existence as late as 1827, and that the courses were copied in a M. S. book by the surveyor of Jefferson county. The patent was found in the proper custody, being in the possession of the widow of John Wager, Jr., one of the devisees of Robert Harper. The courses were also copied from the original by a witness who owned a coterminous tract, and was thus interested in learning the true courses of the patent. These two unofficial copies agree perfectly with the original survey and plat, and show that the first call of the Harper patent was for a line running from a sycamore on the edge of the Shenandoah river, extending down said river S. 55 E. forty-four poles. In all other respects the copy of the patent conforms to the survey. The two first calls of the patent, thus corrected, are as follows: "Beginning at a sycamore standing on the edge of Shenandoah river, and extending thence down the said river S. 55 E. 44 poles, N. 66 E. 72 poles, to a sycamore, standing at that point." The point here referred to is clearly the point of land formed by the confluence of the two rivers, for the next call is for a line running up the Potowmac.

I will first enquire whether the boundary of the Harper patent, on the Shenandoah side, is the river itself, or the two right lines thus designated. It is a fundamental principle in the law of boundary, that course and distance must yield to a natural or artificial monument; that is to say, if there are two calls in a patent, one for a magnetic line of a given course and distance, and the other for a permanent sensible object as the terminus of the line, if the magnetic line, making proper allowance for magnetic variation, will not reach the object, the line must be abandoned, and the known monument must be reached by a line which will conduct you to it, however variant it be, both in course and distance, from the magnetic line called for in the patent. There is no controversy between the counsel as to this principle. Applying it to the case at bar, we find that the two magnetic lines first called for in the patent, with due allowance for magnetic variations, instead of running to the sycamore at the point, terminate at nearly the middle of the Shenandoah. These two lines are designated in the plat of survey made by the surveyor in this cause, by the letters and figures A 5, 5, 6. These lines must be so varied as to reach the corner, and the two lines A B, B C, on the diagram, represent the two lines required by the principle we are considering. So far, there is no difficulty in the application of the principle. The counsel for the plaintiffs insist that the principle is satisfied by the adoption of the two straight lines A B, B C, (the sycamore called for in the patent being located at or about C, in the diagram,) and that these two lines, in the most favorable view of the case for the defendant, constitute the boundaries of the Harper patent. If this position be tenable, the land lying between the lines A B, B C, and the Shenandoah, was subject to entry by the plaintiffs as waste and unappropriated land, and a title to it is vested in the plaintiffs by their patent, unless the title of the commonwealth has been lost by adversary possession by the United States or by those under whom they claim. The counsel for the defendant insists that the Shenandoah, and not any right lines whatever, constitutes the true boundary of the Harper patent. The call is for two lines extending down the river, certain courses and distances, to the point. The beginning corner is on the edge of the Shenandoah. The terminating corner of these lines is at the mouth of the same river. It is said that a call for a line extending down the river, in connection with a call for course and distance, is merely a descriptive and not a locative call, and that course and distance, varied only so far as may be necessary to reach the known monument at the point, must prevail. Can this proposition be correct? As the lines were to run from a point on the Shenandoah river to its mouth, the general direction of these lines must have been necessarily down the river. So the courses called for must have necessarily run down the river, that is, in the general direction of the river in its descent to its mouth. There was no necessity to superadd any

other description, and the call to run down the river could add no force to the other calls to run to the mouth by certain courses and distances, considering it as simply descriptive. The term, then, in this view of it, would be supererogatory and useless. It is reasonable to conclude that in employing this term it was intended to indicate some specific purpose, and unless that purpose was to define the boundary of the patent, it is without meaning, and must be rejected as surplusage. But in the construction of written instruments, we must so interpret them as to give significance and effect to every part, if it be possible. Assuming, then, that the expression "down the river" is ambiguous, and might be interpreted with equal propriety, if it stood alone, as either descriptive or locative, that construction ought to prevail which will give it effect, rather than that which would make it senseless, or at the least tautologous. This general view of the subject would lead to the conclusion that, in the absence of all authority, the term should be considered, in the connection in which we find it in this patent, as locative, and not merely descriptive. Let us consider the question briefly with reference to authority.

We have no adjudication of the courts of Virginia involving precisely the question now under consideration, but similar, if not identical, questions have frequently arisen and been adjudicated by the courts of our sister states. Tayl. (N. C.) 136; 4 Dev. 180; Hayw. (N. C.) 297; 4 T. B. Mon. 61; 12 Johns. 252; [Newsom v. Pryor's Lessee] 7 Wheat. [20 U. S.] 7, 5 Pet. Cond. 206; 20 Wend. 149, 156; 3 Ohio; 17 Pick. 357; 2 J. J. Marsh. 160; French v. Bankhead, 11 Grat. 136. After reviewing numerous cases involving this question, the supreme court of New York says: "There will be seen, moreover, a very distinct and strong tendency in the cases I have cited, to turn every doubt upon expressions which fix the boundary next the river, in favor of a contact with the water. The words which in those cases and others have created the most frequent difficulties, are where the termini of the river line stand on the bank at some distance from the stream, and the line is prescribed to run between them, 'along the river,' or 'up the river,' or 'down the river,' or the like. It has been contended in such cases, that the call may well be satisfied by a direct line between the termini irrespective of the immediate margin, or by following at a distance from the margin, the meanders of the stream where the words require that. But all such language has been held to fix the boundary upon the river. These cases show, what it is very difficult for the human mind to resist, that the parties never mean to leave a narrow strip between the land and river, merely because some stake or tree, or even all the stakes or trees of the line stand at a slight distance from the river. The expres-

sion of an intent to run the line along the stream, reaches a distinct natural monument, which overcomes the others. They are rather intended to indicate, or point down to the water line." Starr v. Child, 20 Wend. 156.

If the supreme court of New York have here stated correctly the result of the adjudication on questions of this kind, the present question is closed by authority, so far as the decisions of foreign tribunals can bind this court. A careful examination of all the cases cited, satisfies me that they fully sustain the positions taken by the court of New York, and I have cited the above passage at large, because it expressed, in language at once lucid and terse, the result of the cases reviewed. I may remark, too, that this very passage is quoted with approbation by Judge Allen, president of the court of appeals of Virginia, in delivering the opinion of the court in the late and yet unpublished case of French v. Bankhead. I have no time to discuss at large the cases referred to by the supreme court of New York, and must content myself with a brief reference to one of them, which presents the very question involved here. The case of Bruce v. Taylor, 2 J. J. Marsh. 161, is the case referred to. The last call of the patent was for courses and distances from a stake on the Ohio river to the beginning, which was also on the Ohio. The lines called for, without any intermediate corners, were in the general direction of the river, but there was no call to run down the river. The land was described in the patent as lying on the Ohio river. The court said the river was the boundary, and their reasons for this conclusion are thus succinctly stated: "The stake called for is on the river; the intermediate courses are in the general direction of the river; no corners are called for; the courses and distances are not accurate, but such as would be called for when, intending that the river should be the boundary, the surveyor would not be particular in ascertaining by his compass the exact course, nor with his chain, the precise distance." This case goes much farther than we are required to go, to establish the Shenandoah as the boundary of the Harper patent. There the court inferred that the river was intended to constitute the boundary from the fact that the two termini of the intermediate lines were on the river, and that the intermediate lines without any established corners, were in the general direction of the river. Now looking at the Harper patent in connection with the plat of survey, we find that the two termini of the lines are on the Shenandoah; that the intermediate courses are in the general direction of the river; that no corner is called for; that the courses and distances are not accurate, &c. So far the cases are identical. But the two cases differ strikingly in this: that in the Kentucky case the conclusion that the parties intended to adopt the river

as a boundary is deduced, as an inference merely from the circumstances stated by the court, while in the case at bar the call to run down the river is found in express terms. Mr. Stuart's objection that if the parties had intended to run by the river, no intermediate lines, or but one intermediate line, would have been called for, is answered by the above case. It is proper, where a river is designed to be the boundary line, that the surveyor should run as many intermediate lines as the natural curvatures of the stream will render necessary to make the magnetic lines correspond with the general course of the river. These lines must be run by the surveyor, in order to compute the area of the land surveyed, and the fact that such lines are called for in the patent, and laid down in the plat and survey, constitutes no ground for the conclusion, that the parties intended to bound the land by the magnetic or other right lines, rather than by the river. Indeed, Mr. Michie, in his commentary on the case last cited, drew the very opposite conclusion from the number of these magnetic lines conforming in their general direction to the course of the river. It would have been quite as logical to deduce the conclusion, in the case at bar, that the river was designed as the boundary, from the fact that the intermediate lines here called for no corner, and were in the general direction of the river. This case, then, is an apt and close authority in support of the position of the defendant's counsel, that the river, and not the straight lines, is the true boundary of the Harper patent. The case, indeed, is of no binding authority upon the court, but is persuasive merely. Is the case, then, consistent with reason and the principles of law? The fundamental principle we have been considering, that where there is a conflict or repugnance between magnetic or imaginary lines, and natural or artificial monuments, the former must yield, is one of the wisest in the law. It is a principle of repose. It gives certainty and definiteness to the boundaries of co-terminous tenants; it gives stability and firmness to land titles. The compass is so uncertain a guide, that no two surveyors, perhaps, ever perfectly agreed in running a survey by magnetic lines. It is the natural or artificial monument alone, which gives fixedness or certainty to boundary. In the case at bar, the terms employed in the patent cannot otherwise be satisfied than by holding that the river Shenandoah is the boundary of the Harper patent, from the beginning corner to the mouth of that river, and, sustained, as I conceive that construction to be, both by reason and authority, I have no hesitation in adopting it.

The next call of the patent is for a line extending from the point up the Potowmac, a certain course and distance, to a chestnut near the river. The precise language of the patent is: "Thence up the Potowmac river N. 48. W. two hundred poles to a chestnut tree standing near Potowmac, opposite to a small island." There is much conflict in the testimony as to the precise locality of the chestnut called for as the terminus of this line, the evidence on the part of the plaintiff tending to show that it stood on ground now covered by the U. S. canal, designated in the plat of survey as "Red 18," that on the part of the defendant tending to locate it at G, a point on the embankment of the Baltimore and Ohio Railroad. The latter point is opposite to a small island, in the Potowmac, the former is near a small promontory jutting into the river, and evidence was offered by the plaintiffs to show that this promontory was originally an island, and that the railroad company made it part of the main land by filling up the intermediate space with earth. Assume either hypothesis, and the call for a monument near the Potowmac and opposite to a small island is satisfied. The point claimed by the plaintiffs is some feet more remote from the river than that insisted on by the defendants, and if a straight line drawn from the point of the confluence of the two rivers to the chestnut, is the true boundary, such line drawn to red 18 leaves a larger space between it and the river than a line drawn to G. But so far as the legal question in the instruction under consideration is involved, it is a matter of perfect indifference whether the true terminus of the line called for be at red 18, or at G. The question is not, which of these two lines is the boundary, but whether either is. The first is a question of fact, the second of law. If the patent makes the Potowmac the boundary, it excludes both. We proceed to enquire what is the true boundary of the Harper patent on the Potowmac side.

If the call of the patent was to run up the Potowmac, by course and distance, to a corner tree on the river, it would present the precise question already discussed with reference to the boundary on the Shenandoah side. But the call is for a chestnut near the Potowmac. It is said that this description is so vague and indefinite that none other than a straight line between the termini can be held to be the boundary. The expression is certainly indefinite, and when applied to the terminus of a line of 200 poles, might equally be satisfied by a terminus a few feet, or a few poles from the river. But every physical object or monument called for as the terminus of a river boundary, must of necessity be more or less vague, since no such monument can be found that is always in contact with the water line which in itself is an ever varying and shifting line. So a call for a tree on the bank of a river does not precisely define its distance from the water. This description may be accurate and yet the tree may be removed many feet from even high water mark. In the construction of patents or other muniments of title, as of all other written instruments,

the great desideratum always is to ascertain the intention of the parties, and to give effect to it, if that intention contravenes no principle of law, or public policy. Looking at the calls of the patent here, in connection with the plat of survey made in the cause, we perceive that a straight line, drawn from the point to the object called for, leaves a narrow strip of land between it and the river, not exceeding in its greatest breadth, some 12 or 15 poles. We find that the Potowmac here, instead of making an abrupt curve, as does the Shenandoah just before reaching the point, sweeps on to its confluence with the Shenandoah, with a curve of large radius. It is difficult, when we come to apply the calls of the patent to the diagram before us, to resist the conclusion, that the chestnut tree, described as being near the Potowmac, is made the terminus because of its contiguity to the river. It is not only described as being near the river but so near to it as to be opposite to a small island standing near the river. This gives more definiteness to the description and strongly fortifies the conclusion that the object was selected as the monument of a permanent character in nearest proximity to the river.

There is one other document in evidence in the cause, which throws additional light upon the question. A second patent was issued by Lord Fairfax to Robert Harper, conveying 92 acres contiguous to the tract of 125 acres. The chestnut tree in question, is made the beginning corner of this other tract, and it is described as a chestnut tree standing on the Potowmac river. Placing these two documents in juxtaposition and construing them with the plat before us, all doubts as to the meaning of the parties vanishes, and the mind reaches a conclusion in the soundness of which it rests with perfect confidence, that they intended to adopt the Potowmac river as the boundary of the tract from the mouth of the Shenandoah to the chestnut tree, called for as the terminus of the designated line.

But it is asked, if the Potowmac be the boundary, how can you ever reach the chestnut? As the tree is not in contact with the water, there must be some space between it and the river. Both are boundaries. How can you connect them? By a straight line drawn at right angles to the river, or at what other angle? The answer to this supposed difficulty is easy.

It is an established principle of law that where a creek or river which is not navigable is the boundary of land, the title of the proprietor extends, by construction of law, ad medium filum aquae, or to the middle of the river, 12 Johns. 252; 20 Wend. 149. Having established these two rivers which are above tide, and therefore are not navigable according to the common law definition, as the true boundary of the Harper patent, the principle we are considering ex-

tends that boundary, proprio vigore, to the middle of those rivers respectively. The terminus of this line up the middle of the Potowmac is that point of it, from which a straight line, drawn to the chestnut called for by the patent, will, in its extension, strike the next corner called for. This chestnut tree is not, indeed, in the ordinary sense of that term, a "corner" tree at all. No angle is made at it by the boundaries here established. In the language of the supreme court of New York in a case already cited, "it is rather intended to indicate or point down to the water line."

We deduce, then, from the patent itself, and the other documentary proofs in the cause, the inference that it was the clear purpose of the parties, both grantor and grantee, that all the land lying between the Shenandoah and Potowmac rivers, from the beginning corner on the first to the terminating corner on the last, should be embraced in the patent. If we look beyond the documentary proofs to the character of the subject of the grant, our conclusion must be the same. The land itself was wholly incapable of cultivation, except a narrow margin extending from the base of the cliff on either side to the rivers respectively. It was the abrupt terminus of a mountain ridge, whose rude cliffs and vast overhanging crags were full of picturesque and romantic beauty, but were wholly valueless for purposes of tillage. Its water power was fast, and the patentee proceeded to erect a water grist mill and saw mill on the Shenandoah side. It presented rare advantages for the establishment of a ferry connecting the Maryland and Virginia shores. Accordingly a public ferry was established there as early as 1753, only two years after the date of the patent, and it thus acquired, more than two hundred years ago, the now celebrated name of "Harper's Ferry." The ferry landing was on the Potowmac side near the point, and was for a long series of years a source of large revenue to the original patentee and to his devisees. The establishment of this ferry must have been the leading object of the acquisition, the landing was immediately occupied for that purpose, and that occupation was continued till within a comparatively recent period, for we find that when the devisees of Harper made the conveyance of the land to George Washington, president of the United States, in 1796, there was an express reservation of this ferry landing. Yet Robert Harper was a trespasser in thus taking possession of this landing, if the pretensions of the plaintiffs are well founded; for it was not embraced within the lines of his patent, if the tract was bounded by right lines and not by the river. It would be very absurd to suppose that, in obtaining his patent, he intended to cut himself off from access to the waters of both rivers, which alone could impart value to the acquisition. Whatever view, therefore, we take of the

question of boundary, we are constrained to say, that the rivers Shenandoah and Potowmac constituted that boundary, and not any imaginary lines whatever. The first instruction moved for by the defendant is given to the jury in the terms in which it is incorporated into this opinion.

The second and third instructions asked for by the defendant have reference to a supposed title acquired ·by the United States by mere length of possession, and by virtue of the operation of what is called the "Settlement Law," passed by the legislature of Virginia in 1798. These instructions are based upon the hypothesis that the lands lying between the right lines A B, B C, C G, or C 18, and the rivers Shenandoah and Potowmac respectively, were not covered by the Harper patent. Having decided, however, that those lands were comprehended within the lines of the original patent, the hypothesis upon which they rest is destroyed, and they are irrelevant and impertinent. The court, therefore, declines to give them.

NOTE BY THE JUDGE. The first instruction asked by the defendant having been given, the jury rendered a verdict for the defendant without retiring from their box. The plaintiffs excepted to the opinion of the court, with a view to the prosecution of an appeal to the supreme court of the United States.