Dunham v. Williams.

[KINGS GENERAL TERM, February 10, 1862. *Emott, Brown* and *Scrugham,* Justices.]

---

## DUNHAM and BEACH *vs.* WILLIAMS and PARKER.

Where the language of an act of the legislature, incorporating a turnpike company, is such as to vest the title to the land over which the road passes, in the company, it must nevertheless be considered as vested only for the purposes of the road; and when the road is abandoned, the land reverts to the original owners.

Where premises conveyed by deed were bounded easterly by a road or public highway, without any words indicating an intention to limit the eastern boundary to the westerly line of the road; *Held* that the words of the grant included, by fair interpretation, the one half of the road bed.

And where the grantees, and those claiming under them, had been in the actual possession of the lands adjoining the road, under such a deed of conveyance, subject to the public easement of the highway, for more than 70 years; *it was held* that they were in the constructive if not the actual possession of the western half of the road bed, sufficiently to enable them to maintain trespass or ejectment.

Dunham *v.* Williams.

The Brooklyn, Jamaica and Flatbush turnpike company did not acquire, and had no authority to acquire, under their act of incorporation, any other estate in the lands taken for their road, than an incorporeal hereditament, or right of passage.

ACTION of ejectment, involving the title to land forming part of the road bed of the Brooklyn, Jamaica and Flatbush turnpike road, running from the Brooklyn (Fulton) ferry to Flatbush, and branching beyond the premises in question to Jamaica. The *locus in quo* constituted a piece of the road between its western side and centre line, near Hanson place, within the present limits of the city of Brooklyn. The defendant Williams claimed as grantee from the turnpike company; the plaintiffs, as being the owners of the adjoining premises. The plaintiffs offered evidence tending to establish that, before 1808, one George Powers was in possession of a farm of land embracing premises on the westerly side of and adjoining, and bounded on the east by, the road in question, which were conveyed to him by deeds from persons claiming from one Michael Bergen, dated May 11th, 1787, and recorded June 14th, 1808, and that by deeds and devise from George Powers of premises described as bounded by the road, or including any interest in it, they had become possessed of the adjoining premises, for convenience called the "Powers farm;" that the road had been five or six years before the trial discontinued for general travel, and that some two years before, the defendants had fenced in and occupied the premises in question. For the defendants, by their own evidence and that of the plaintiffs, the following facts appeared: The Powers farm was originally granted by the Dutch governor William Kieft, on behalf of their high mightinesses the lords states general of the United Netherlands, &c. (the Dutch government) by patent dated February 22d, 1646, to one Huyck Aertsen Van Rossum, whose patent was confirmed by the English governor Richard Nicholls, June 21st, 1667, to Albert Cornelissen, the next proprietor under Van Rossum's patent, from whom the title was transmitted

to Michael Bergen, mentioned in the plaintiff's evidence. Before 1646, and at least twenty years before the Dutch surrendered their New Netherlands colony to the English, in 1664, the road in question, opposite the Powers farm, identical with the road as last in existence, had been laid out, and was in use as such; it appearing that it had been from the earliest settlement of the country the road between Brooklyn and Flatbush, which was settled as early as 1634, and Flatlands settled in 1636; and that in fact it had been an old Indian path before it became a highway. It is mentioned in patents from Governor Stuyvesant to premises on either side of and near the Powers farm, as early as 1654, 1655, 1656 and 1658, as the "great road," "the public highway," and "the highway." In 1654, the Dutch church at Flatbush, in 1662, that at Flatlands, and in 1666, that at Brooklyn, were built all on and with reference to this road, which was used till their churches were built, by the people of Flatlands and Brooklyn, in going to and returning from church at Flatbush, which, until 1786, when Brooklyn took its place, was the county town of and most considerable place in Kings county, having at that time less inhabitants than in 1664. This road was the only avenue of which there is any tradition or history during all the years referred to, for the travel made necessary by the importance of Flatbush, between the ferry to New York and Flatlands, and the lower end of Kings county on the one hand, and in fact Jamaica and the upper end on the other. In 1709, as appears by an entry dated March 28th, 1709, in the road record book of Kings county, (made evidence by section 6 of the act of April 2d, 1801, Brooklyn laws, p. 53, appendix, Furman,) under an act of the colonial legislature, passed May 6th, 1691, (*Van Schaick, p.* 3,) permitting the commissioners therein provided to "lay out, *set forth*, regulate and amend highways," &c., the road was recorded as a public common highway, "as the way is now in use," four rods wide, the width at all times till it ceased to be a road. It is again

recognized in an act passed July 27th, 1721, (*Van Schaick, p.* 125,) as having been as it then was for over sixty years; is laid down on Lieut. Ratzer's map, from surveys made in 1766 and 1767; and in 1804 or 1805, and again in 1810 or 1811, was surveyed by Jeremiah Lott, examined as a witness for the plaintiffs. On March 17th, 1809, was incorporated the Brooklyn, Jamaica and Flatbush Turnpike Company, which laid out, and thence used and occupied the road authorized by their act directly over the old highway at the place in question, Mr. Lott making the necessary surveys; and on August 1st, 1809, by inquisition then taken, the appraisers appointed in pursuance of the act for the highway, found by them as taken and appropriated by the company, awarded as damages $100 to the town of Brooklyn, and $50 to the town of Flatbush, as being the owners of the land. On April 25th, 1832, was incorporated the Brooklyn and Jamaica Rail Road Company, by act of the legislature (*Laws of* 1832, *p.* 453) of that date, permitting and requiring the company (section 27) to purchase, and in pursuance of which they did, by deed dated August 2d, 1833, and recorded September 10th, 1835, purchase the road in question. That company, by acts of May 13th, 1846, (*Laws of* 1846, *p.* 441,) and April 12th, 1848, (*Laws of* 1848, *p.* 489,) were permitted to sell the property so purchased, including the road, and did grant the part embracing the premises in question to the defendant Williams' grantors by deed dated May 3d, 1853, recorded June 10th, 1853. The act of 1846 (section 17) in terms provided that the parts of the road granted, as by it permitted, should "belong absolutely to the purchasers or grantees thereof." The defendants also proved the capitulation and surrender by the Dutch to the English on August 27th, 1664, and their return and possession, till their final expulsion in 1667; that on October 18th, 1667, Governor Nicholls gave a patent or charter, confirmed May 13th, 1686, by Governor Dongan to the freeholders of Brooklyn, whereby he granted to them the tract of land embracing the

Dunham *v.* Williams.

town, describing its limits, including, as shown by the confirmatory patent, "all highways," &c.; and that up to and after 1692, the common lands of the town of Brooklyn bounded the road in question on the east, and doubtless embraced it, the road having been in existence before any grants were made of land on either side of the road, and neither the grant of the Powers farm or others embracing any part of the road. The action was tried at the circuit in Kings county in November, 1860, before Justice EMOTT and a jury. At the close of the testimony, the judge directed the jury to render a verdict for the plaintiffs. The jury found a verdict accordingly; and the court ordered the exceptions taken at the trial to be heard in the first instance at the general term. The defendants appealed.

*J. E. Parsons,* for the appellants. I. Proof of title to premises bounded by a road is not conclusive evidence of, but merely affords the presumption of title to the soil, *usque ad filum viæ.* When a road runs through a man's land, *prima facie,* the fee of the land over which the road runs belongs to him, for the reason that the road is presumed to exist either by use, with the license of the owner, in which case the public acquire, by prescription, a mere right of passage, or to have been opened under the provisions of a statute permitting to be taken merely such right of way. · (*Gidney* v. *Earl,* 12 *Wend.* 98.) Possession of the adjoining premises is by no means tantamount to actual possession of the road bed. Such possession could never, coupled with a claim of title adverse to the claim of title of the public, road commissioners, the town, or a road corporation in possession and use of the road bed as a road, constitute title by adverse possession; on the contrary, title to the road bed in an adjoining owner would be defeated by adverse possession for a sufficient length of time, by one using for purposes other than mere right of way. (*Read* v. *Leeds,* 19 *Conn. R.* 182. *Etz* v. *Daily,* 20 *Barb.* 32.) It is as necessary for the plaintiff in ejectment to prove title

where the premises are in the bed of a road, as to any other premises. The fee of a road bed is not an incident to the adjoining land, and will not pass with a grant merely of such land. To pass the title to the soil of the road, words of description must be used which, in contemplation of law, embrace and include it. The fee of one piece of land not mentioned in a deed cannot pass as appurtenant to another. (*Jackson* v. *Hathaway*, 15 *John.* 447. *Witter* v. *Harvey*, 1 *McCord*, 67. *Tyler* v. *Hammond*, 11 *Pick.* 194.) And so, though in contemplation of law, possession of adjoining premises presumes possession of the road bed, and possession, title, such proof of title by a plaintiff in ejectment will be defeated by proof, that a former owner of road bed and adjoining premises, in granting the adjoining premises, used words of description which are not construed to include the road. (*Jackson* v. *Hathaway, supra. Child* v. *Starr*, 4 *Hill*, 373.) A claim of title, therefore, to the soil of a road, resting, as in this case, on mere proof of possession of adjoining premises (in George Powers) as *prima facie* evidence of title, will be defeated by proof of better possession in another, or by overcoming either of the presumptions from which the doctrine springs : *i. e.* proving that the road was not opened over land at the time forming part of the adjoining close, or that the statute under which the road was opened provided that the fee of the road bed should be taken. (*Wetmore* v. *Story*, 3 *Abbott*, 277. *Storer* v. *Freeman*, 6 *Mass. Rep.* 435. *Hatch* v. *Dwight*, 17 *id.* 298. *Bartow* v. *Draper*, 5 *Duer*, 130.) An adjoining owner, as such, acquires no interest in the road bed ; he merely retains his original title, if any. The road ceasing, his title, if any, remains discharged of the right of passage ; of course he takes nothing where, as here, he, or those through whom he claims, parted with nothing for the road. (*Willoughby* v. *Jenks*, 20 *Wend.* 98.)

II. The common source of title to the premises in question and the adjoining premises, was the Dutch government ;

(*Denton* v. *Jackson*, 2 *John. Ch.* 324; *North Hempstead* v. *Hempstead*, 2 *Wend.* 110;) which granted a patent for the the Powers farm in 1646, at which time the premises in question were in use as a highway. The civil law prevailed in the Netherlands and their colonies at that time. (*Hoffman's Treatise on the Corp. p.* 258. *Encyclopedie Raisonee, tit. Droit.* 1 *Brown's Civil Law,* 7. 1 *Blackstone's Com.* 15. 1 *Kent's Com.* 515, *n. c,* 516, 543. *Cortelyou* v. *Van Brundt,* 2 *John.* 359, 363. *Wetmore* v. *Story,* 3 *Abbott,* 280, *argument of C. O'Conor, Esq. Van Leuwen's Com. on the Roman Dutch law, Eng. ed.,* 1820, *preface.*) And under the rule of the civil law, the sovereign or government was always the absolute owner of the soil of highways; the title of the adjoining owner was always absolutely divested where a road was opened over private premises. (3 *Kent's Com.* 526. *Traite des Servitudes,* 648, 649. *Delalure des Servitudes,* 529, *n.* 648. *Partida,* 3, 28, 6. 1 *Denisart,* 354, *verbo Chemin, art.* 5. *Metzinger* v. *The Mayor &c.,* 3 *Mart.* 303. 1 *Gibbon's Decline and Fall,* 66, *Lon. ed.* 1838.) See *Benthrop* v. *Bourg,* (4 *Martin's La. Rep.* 97,) citing *Digest, lib.* 43, *tit.* 8, *Law* 2, § 21, as follows: "Translated literally," says Judge Martin, "we call a public road that of which even the soil is public. We do not take it to be in a public road as in a private one, the soil of which belongs to another, while we have only the right of walking or driving over it." The soil of a public road is public. The fact of ownership in the Dutch government of road bed and adjoining premises when was granted the patent of 1646, does not show that in making such grant the government intended to vest in the patentee any right in the soil of the road. 1. The words of the description of the grant do not include any part of, or interest in the bed of the road, directly or by implication, which would be necessary to pass it under the common law; but exclude the idea that any thing was granted in which any right or interest was reserved. Grants of things public are never presumed. Such grants are construed most strongly

in favor of the grantor. (*Domat, vol.* 1, *lib.* 1, *tit.* 1, § 2, *art.* 17. 2 *Black. Com.* 347. *Palmer* v. *Hicks,* 6 *John.* 133. *Lansing* v. *Smith,* 4 *Wend.* 23.) 2. The grant is to be construed and governed by the civil law under which it was made, and by which, as just shown, the fee of the road was always in the government. *Renthup* v. *Bourg* was a much weaker case than this. The state patented to the plaintiff's grantors premises, *including land,* subsequently laid out and used as a road, and afterwards by act, making no provision for compensation, appropriated it as a highway, upon which the defendant built a ferry house. Held, in the language of the head note, "the soil of a highway is public property, and cannot be recovered in an action between individuals." Judgment of district court affirmed, and a motion for a rehearing, argued at great length by Edward Livingston, refused. (4 *Mart.* 168.) Nor can it be contended that the interest of the public was only a qualified fee of such character, that on closing the road the soil would pass to the adjoining owner. (4 *Merlin's Rep. Jur.* 188, *ed. of* 1825, *Brussels, tit. Chemin Public.*) The sovereign power would equally have become the owner in fee to any part of the road laid out over the Powers farm, after its original grant by the Dutch governor. The patentee took, subject to the application of this doctrine of the civil law, and held in subordination to it. He is presumed, in paying for his patent, to have estimated for this sovereign right to appropriate, in fee, soil needed for a highway—took by his patent so much less— and this reserved right passed, on the surrender, to the English crown, without being divested by the accession of the common law. (*Hoffman,* 257, 265, 268, 291, 295.) The difference between the rule of the civil and that of the common law has always been recognized, followed and affirmed by all legislation in respect to roads affecting the portions of the state settled by the Dutch, pre-eminent among which is Kings county. This will appear by a comparison of the various highway acts of the state, with all special turnpike

company charters, part of the case. (*Jenkins* v. *Union Turnpike Co.*, 1 *Caines' Cases*, 93.) Those specially applicable to Kings, Queens and Suffolk counties, using language which will be shown to authorize the acquisition of the fee, while the acts providing for roads in other portions of the state merely provide for taking a right of way. The first general act relating to highways, was passed May 6th, 1691. (*Van Schaick, p.* 3.) It is very brief and indefinite, applicable to existing roads, not intended to provide for taking land for roads, as sufficiently appears by its title, "An act for enabling each respective town within this province to regulate their fences and highways, and make prudential orders for their peace and orderly improvements." On July 17, 1721, (*Van Schaick*, 126, ed. *Colonial Laws*, 1726, *p.* 207,) was passed a more comprehensive act, providing specially for highways in various places, appointing commissioners by name in many towns, and as to Kings and Queens counties, specially directing how lands may be acquired for roads. If less than ten wish the road, they, and if more than ten, the town shall "pay and satisfy the owner or owners through whose land such road or highway is laid out  *  *  *  *the true value thereof*, according as it shall be adjudged," &c., instead of damages sustained by the owners as provided in respect to roads in the English portions of the state. This act was continued as to Kings and Queens counties by acts of October 29, 1730, (*Van Schaick*, 156,) October 14, 1732, (*Id.* 169,) November 17, 1739, (*Id.* 206,) which finally merged in the act of November 29, 1745, (*Id.* 262.) "An act for  *  *  *  regulating and further laying out public &c. highways in Kings county." Commissioners are to be elected who may lay out roads, but not through private lands "without the consent of the owner of the lands, or paying the true value of the lands so laid out." And those for the rest of the state, in the act of March 21, 1797, (3 *Greenl.* 406,) "An act to regulate highways," &c. Section 1, as the preceding intermediate acts, excepts Kings, Queens and Suffolk.

Dunham *v.* Williams.

Where a road is laid out under it through private lands, it is provided, following the rule of the common law, as the preceding acts applicable to other parts of the state, "that the owner or owners shall be paid such damages as such owner or owners may sustain by reason thereof." In 1789, by act of February 2d, (2 *Greenl.* 222,) the act of 1745, in reference to Kings, Queens and Suffolk, was somewhat modified and re-enacted with the provision still retained, (section 1,) that it shall not be lawful "for the said commissioners, or any of them, to lay out any road through any person's land without either the consent of the owner thereof, or paying him the true value of the land so laid out into a highway or road," explained and strengthened in the view for which the defendants contend, by adding, "with such damages as he shall sustain thereby;" and by this act the commissioners are empowered to exchange in certain cases land used for roads, for other lands to be similarly used, the person thus obtaining the disused road bed "to hold and enjoy the same to him, his heirs and assigns forever." In 1801, at the same session of the legislature, were passed two acts, in slight respects modifying the above; one on April 2d, (2 *Kent & Rad.* 191,) in reference to Kings, Queens and Suffolk, and the other on April 8th, (1 *id.* 588,) excepting those counties. By the former, (section 1,) the owner of land taken is to have "the true value of the land, with such damages," &c., as in the act of 1789, while by the latter, (section 15,) as in the act of 1797, he merely receives the damages sustained. So on April 2d, 1813, was passed an "act to regulate, &c. highways in Kings, Queens and Suffolk," &c., (2 *R. L.* 304,) revising and re-enacting the preceding act; though on March 19, 1813, at the same session (*Id.* 270) the general act was also passed, providing that where a road shall be laid through private lands, "the owner or owners shall be paid such damage as such owner or owners may sustain;" the act for Kings, &c. in the similar case, providing (section 3) that such road shall not be so laid out

"without either the consent of the owner thereof, or paying him the true value of the land so laid out into a highway, and such damage as he shall sustain thereby." Section 1 of the latter act permits the road commissioners to close roads in their discretion, as also does act of 1835, (*Laws of* 1835, *p.* 136,) and proceeds: "And the said commissioners are hereby authorized to sell and convey all such roads as they shall think proper to close or shut up, and shall offer the land contained in such road at three-fourths the true value thereof (according to their best judgment) to the person or persons who may own the land adjoining; and if such person or persons refuse to purchase the land contained in such closed road at such estimate, the commissioners may dispose of it to any other person or persons at the same or a higher valuation;" with a proviso pointing to the very distinction claimed, that roads which have become public highways by twenty years' use before March 21st, 1797, and are not recorded as was this one, (roads by prescription merely,) shall revert, &c. The provision of the act of 1789, for an exchange of road bed, is also retained. By an act passed April 11th, 1808, (5 *Kent & Rad.* 386,) amending the general act of 1801, and specially excepting Kings, Queens and Suffolk, a similar power (section 1) is given to road commissioners to close roads; no provision being made for the land, which is left to take care of itself, of course, on the idea that it reverted. The rule of the common law has not been invariably followed in England, it appearing that in certain cases, even there, parliament gave and exercised the right to sell an old highway when closed. (*Statute* 13 *Geo.* 3, *ch.* 78, § 17. *Woolrych on Ways,* 60.) This statute, by the constitution of 1777, became a law of the state. (1 *Kent's Com.* 524.)

III. The power of the legislature, in the exercise of its right of eminent domain, to permit a title in fee to be taken from private individuals for public purposes, is well established. The only question which arises is whether, in a given case, the language of the grant of power manifests an inten-

Dunham *v.* Williams.

tion in the legislature to permit a fee to be taken. So held as to the canals. (*Baker* v. *Johnson*, 2 *Hill*, 342, 348. *The People* v. *Hayden*, 6 *id.* 359. *Rexford* v. *Knight*, 15 *Barb.* 643.) So held as to land taken for Bellevue hospital. (*Heyward* v. *The Mayor &c.*, 3 *Seld.* 314.) For markets. (*Laws of* 1816, *ch.* 53.) So held as to land taken for turnpikes. (*Dumond* v. *Sharts*, 2 *Paige*, 184. *Rogers* v. *Bradshaw*, 20 *John.* 741. *Estes* v. *Kelsey*, 8 *Wend.* 559.) For city streets. (2 *R. L.* 19.) Seventeenth street. (1 *Wend.* 262.) So held by the supreme court, and assumed by the court of errors, as to land taken for a railway. (*Bloodgood* v. *M. & H. R. R.*, 18 *id.* 26, *opinion of Edwards, senator*. (1.) The evidence on the part of the plaintiff showed the road in question in existence as a highway before 1807. The legal assumption in reference to a road shown to be open for several years is, that it was regularly opened under the laws in force at the time of and immediately prior to its first proved existence. (*Colden* v. *Thurbur*, 2 *John.* 424. *Ward* v. *Folley*, 2 *Southard*, 482. *Williams* v. *Herring*, 18 *Pick.* 312.) The acts under which this road would be thus presumed to have been opened, would be of July 17, 1721 ; November 29, 1745 ; February 2, 1789 ; April 2, 1801 ; and the other acts above referred to. Under either of which would the interest of the adjoining owner have been divested, and become vested in the sovereign or people, to be held and disposed of for them by the road commissioners. (*Act of* 1813, *April* 2.) Under those acts, the adjoining owner receives " the value of his land"—not the mere damages sustained. He receives that as well, and he parts with that, the equivalent of which he receives, *i. e.* his land. The difference of phraseology used by the legislature at the same session, in the act relating to Kings county, and the general act, proves a difference of intention. Under the general act, the right of way is taken. The only estate which will satisfy the provisions of the special acts is a fee. The language is as strong in this view as it could be made, and quite as strong as that used in acts under which

.Dunham *v.* Williams.

a fee has been held to be taken. (*Estes* v. *Kelsey*, 8 *Wend.*
559. *Dumond* v. *Sharts*, 2 *Paige*, 184, *and other cases
above.*) The motion to dismiss the complaint should have
been granted. Nor has the defendants' evidence, showing
the earlier existence of the road, cured this error. There is
no inconsistency between the recognized use and existence as
such of a strip of land for a road bed, and its being subse-
quently legally opened as a highway by statute. That very
case is provided for by nearly, if not quite, all the acts in ref-
erence to highways. (2.) The plaintiffs' proof of the exist-
ence of the road as a turnpike, and of its being laid out as
such in 1809, afforded the presumption, and the defendants'
proof established the fact, that the road was regularly laid
out as a turnpike under the act of 1807, and thereby the
title to the road bed became absolutely vested in the turnpike
company. By their charter, the company acquired the spe-
cial privileges therein mentioned, and in addition, such as
were granted by the general act of March 13, 1807. The fee
of land taken for a turnpike road under that act is acquired
by the company. (*Estes* v. *Kelsey*, 8 *Wend.* 559.) That
the act intended that the soil of the road should be taken, ap-
pears conclusively from section 3, which provides that when
an old highway shall be appropriated for a turnpike, a sepa-
rate appraisement shall be made for the easement, to the town,
and for the soil, to the owner thereof ; and, by the language
of the act, the company hold land taken under it, to them and
their assigns forever. The language of the company's char-
ter is broader and stronger, and has been expressly held to
vest in the turnpike company a fee in the land taken under
it. See *Dumond* v. *Sharts*, (2 *Paige*, 184,) in reference
to the Chatham Turnpike Company, the language of the cor-
responding provision of the charter of which (*act of April
10, 1804*, 3 *Kent & Rad.* 579, § 1) is, that the company
" shall be in law capable of purchasing, holding and convey-
ing any estate, real and personal, for the use of the said cor-
poration, provided that the amount of such real estate, which

the said corporation are hereby authorized to purchase and hold, shall not exceed, at the time of purchasing the same, $500; and provided further, that such estate, as well real as personal, so to be purchased and held shall be necessary to fulfill the end and intent of the said corporation, and to no other purpose whatever." Section 6 provides for acquiring land. "The value and damages," &c. to be appraised, and, on payment of the award, the company are " to have and to hold to them, their successors and assigns forever." See also *Rogers* v. *Bradshaw*, (20 *John.* 741,) in reference to the Waterford and Whitehall Turnpike Company, the corresponding provisions of the charter of which (*act of March* 28, 1806, 4 *Kent & Rad.* 522) are as follows: Section 1 provides that the company " are hereby declared capable in law * * * of purchasing, holding and conveying any estate, real or personal, that they may deem necessary, to enable them to fulfill the end and intent of the corporation, provided," &c. Sections 6 and 7 provide for acquiring land against the consent of the owner, he to have " such value and damages as shall be agreed upon, or, in case of disagreement, shall be assessed," &c. (*Per Cowen, J., The Seneca Road Co.* v. *The Aub. and Roch. R. R. Co.*, 5 *Hill*, 172. *United States* v. *Harris*, 2 *Sumn. C. C. R.* 21. *Harris* v. *Elliott*, 9 *Peters*, 25.) The language of section 4 of the general act of 1807 follows in detail, and almost verbatim, the provisions of these acts as to the appointment of commissioners, their proceedings, and for what they are to award. There is manifest incongruity in the company's charter permitting them to " convey" lands, if their estate in the lands died when they ceased to use them as a road. The limitation " for the use of the said corporation" is of the quantity of land, not in the character of the estate; otherwise the meaning is absurd. How can land be conveyed " for the use ⟨f the" company ? The only known support for a contrary doctrine is an *obiter* remark of Judge Nelson, reversed by the above cases, (*Hooker* v. *Utica Turnpike Co.*, 12 *Wend.* 371,) which would be

correct, adding, in the language of Chancellor Kent, the qualification, " where there is no special statute provision to the contrary." (2 *Kent's Com.* 374, (307.) The Massachusetts cases are under the special act of that state providing for a reverter. (*Act of* 1804, *ch.* 125, § 15.) The acts provided for proper compensation to be given to all parties in interest, and the appraisers awarded $100 for the part of the road in the city of Brooklyn to the town, to be paid to the commissioners of highways, proceeding on the idea that the fee of but little value charged with maintaining a road was in the public or in the representatives of the patentees of Brooklyn, not in the adjoining owners. Had the adjoining owner any interest in the road bed, for which no compensation is shown to have been made, it was lost by the inquisition. It was not essential to the validity of the company's title in fee, that such compensation should be made before entry and seisin in them. (*Rogers* v. *Bradshaw,* 20 *John.* 735. *Bloodgood* v. *Mohawk and Hudson R. R. Co.,* 18 *Wend.* 9.) Or even that the acts themselves should provide for compensation. (*Jerome* v. *Ross,* 7 *John. Ch. Rep.* 343. *Wheelock* v. *Young,* 4 *Wend.* 650.) After a lapse of fifty years, all proceedings to open the turnpike will be presumed to have been regularly taken, and all parties in interest to have been made parties to the proceeding. (*The Seneca Road Co.* v. *The Auburn and Rochester R. R. Co.,* 5 *Hill,* 181.) The entry by the turnpike company gave ample notice to the plaintiffs' grantors, and any right in them was cut off by the proceedings whether the award of damages was made to them or not, their remedy being by review of the proceedings, if the damage was erroneously awarded. (*Colden* v. *Thurbur,* 2 *John.* 425. *Van Steenbergh* v. *Bigelow,* 3 *Wend.* 42.)

IV. The title to the premises in question was therefore in the Dutch government; at the capitulation passed from them to the English sovereign; and so remained, becoming at the separation, transmitted to the people of the state; or, accord-

ing to the better view, by the charters of 1667 and 1686, was granted to the freeholders of Brooklyn. Were neither of these propositions true, it was acquired by the people under the highway acts, and whether in 1809 in the people, or in the Brooklyn freeholders, was taken by the turnpike company on compensation to the representatives equally of the people as of the Brooklyn freeholders. (*Hoff. Treat.* 292. *Act of Oct.* 22, 1779, 1 *Greenl.* 31.)

V. When the Dutch patent of the Powers farm was granted, and up to and after 1692, on the opposite side of the road, the land was a public common, belonging to the lord of the manor, and in this case, in 1692, by the charters of 1667 and 1686, to the freeholders of Brooklyn, whose estate in the road was acquired by the turnpike company. The presumption of title in a road bed by an adjoining owner fails where the road communicates with, is bounded by, or is contiguous to an open common. (*Woolrych on Ways,* 5. *Grose* v. *West,* 7 *Taunt.* 39. *Headlam* v. *Hedley, Holt,* 463.) Where farms were granted by the lord of the manor, bounded by a road in existence before the farms were laid out, on closing the road he remained owner of the soil, under the civil law. (4 *Merl. R. Jur.* 188.)

VI. The title to the premises in question being proved in the turnpike, and subsequently in the rail road company, the title in the plaintiffs and their grantors, not derived through either of those companies, fails; and it matters not where the title now is; the defendant Williams being in possession, the plaintiffs can only put him on proof of his title by proof of title or of earlier possession in them or those through whom they claim. (*Clute* v. *Voris,* 31 *Barb.* 511. *Smith* v. *Lorillard,* 10 *John.* 338.) The defendant Williams did however establish his title; by deed from the turnpike company, authorized to sell and convey by their charter, and the act of April 25th, 1832, (charter of the rail road company,) through the rail road company, by their charter and the acts of 1837, page 414, 1839, page 232, and 1846, page 441, permitted to

purchase and convey, and the subsequent *mesne* conveyances. It is to be remarked, that the acts referred to, in permitting the sale of the road, expressly enact that the estate to be taken by the purchaser shall absolutely vest in him in fee.

*Wm. Curtis Noyes*, for the plaintiffs. I. The plaintiffs made out a clear title to the premises in question by successive deeds and wills from the original proprietor, Bergen, commencing in 1787. (1.) The premises were originally "bounded easterly by the road leading from Bedford to Brooklyn ferry," which, upon well settled common law principles, carried the fee to the middle of the highway.. (*Goodtitle* v. *Acker*, 1 *Burr.* 133. *Lade* v. *Shepherd,* 2 *Strange*, 1004. *Fowler* v. *Sanders*, *Cro. Jac.* 416. *Jackson* v. *Hathaway*, 15 *John.* 447. *Hammond* v. *McLachlan*, 1 *Sandf. S. C. R.* 323, 341. *Williams* v. *N. Y. Central R. R. Co.*, 16 *N. Y. Rep.* 97. 16 *Barb.* 160. 13 *Conn. R.* 23.) (2.) The same description of boundary was continued in the subsequent conveyances, with the like effect. (3.) A possession from 1786, in accordance with this boundary, was proved, and admitted of no dispute. (4.) As against the adjoining proprietor, who owned the fee to the middle of the street, the occupation of the highway as such being a mere easement, could never constitute an adverse possession. (*Smyles* v. *Hastings,* 22 *N. Y. Rep.* 217.)

II. If the Dongan grant or patent of Brooklyn is of any importance in the case, it establishes only that the lands embraced in it, including highways, were granted and held under the ordinary common law rules in regard to both species of property or interests, and not under any anomalous or other Roman or Dutch civil law rule; inasmuch as it expressly declares that they are to be "holden in free and common socage, according to the tenure of East Greenwich, in the county of Kent, in his majesty's kingdom of England," &c. So the deed introduced by the defendants, dated August 21, 1723, expressly recognizes the "king's highway" as

bounding the lands on the east. So the record of March 28, 1709, laying out a road " from the ferry to Brookland, and so all along to Flatbush," also proves that it was a highway subject to the rule of the English common law, as to the rights of proprietors bounded by the road. So the colonial act of 27th July, 1721, proved the same thing.

III. The act of March 17, 1809, under which the Brooklyn, Flatbush and Jamaica Turnpike Company was incorporated, did not, nor did the act of March 13, 1807, (5 *Webster*, 50,) which was applied in part to that act, authorize the taking of any lands, whether a former highway or not, discharged of the claim of the adjoining proprietor to go to the middle of the road when the purposes for which the lands were appropriated, had ceased. On the contrary, the last part of section 3 of the act of 1807 expressly recognizes such right, and provides for compensation for the interest for such adjoining proprietor, as well as for that of the public, in the highway.

IV. That turnpike company never acquired any thing more than a mere easement in the premises in question ; and when the user ceased as a highway, the right to the actual use and occupation reverted to the plaintiffs as owners of the soil, and they were therefore entitled to recover against the defendant who had entered upon them without title. (*Hooker* v. *Utica and Minden Turnpike Company*, 12 *Wend.* 371.)

V. The judge properly excluded the alleged historical evidence *of grants ;* such facts not being capable of proof in that way. (2 *Phil. Ev. by Edwards,* 299. *Morris* v. *Harner,* 7 *Peters' S. C. R.* 554. *McKinnon* v. *Bliss,* 21 *N. Y. Rep.* 206, 214, 215.)

*By the Court,* BROWN, J. When the plaintiffs closed their testimony and rested, upon the trial of this action, they had established, *prima facie,* a title to the premises in question. These consisted of the western half of the road bed of the Brooklyn, Jamaica and Flatbush turnpike road, near

Hanson place, in the city of Brooklyn. The route of the turnpike is at this point identical with an old road mentioned in the deeds of conveyance as the road leading from Bedford to Brooklyn ferry. The plaintiffs claimed title under one Michael Bergen, and read in evidence two deeds of conveyance for a farm of land containing 90 acres, more or less, dated May 11th, 1787. One from Michael B. Grant and Catherine Bergen, relict of Michael Bergen, to George Powers, butcher; and the other from John Grant and Sarah his wife, one of the daughters of Michael Bergen, and Michael B. Grant, eldest son of John Grant, to the same grantee. Jeremiah Lott, who was examined as a witness for the plaintiffs, said he resided in Flatbush since 1779, and knew George Powers the elder. First knew him when he was a butcher; he lived on this farm and died in possession of it. He was succeeded in possession of the farm by his son George Powers, who also died in possession some 15 or 20 years before the trial. His wife succeeded him in the possession. Thought Michael B. Grant was Michael Bergen's daughter's son, and that Powers had the farm from Michael B. Grant. The Powers dwelling house was on the premises, near to and on the westerly side of the road. He surveyed the road for the turnpike company when it was laid out as a turnpike, to which time it had been used as a public highway. It was also proved by the testimony of Silas Ludlam, that he surveyed the premises for Mary Powers ; that herself and son occupied the farm and premises until about ten years before the trial, when the dwelling house was removed by direction of the authorities of the city, on the opening of Flushing avenue. The turnpike road was discontinued as such, and no longer used, about six or eight years before the trial. After Flatbush avenue was graded and paved, the old road became impassable and was discontinued. About five years before the trial, the owners of the land on the side of the road opposite the Powers farm fenced in one half of the road in front of them, and the fence inclosing the half of the road in front of

the Powers property—the *locus in quo*—was built about two years before the trial, by the purchasers from the turnpike company. The plaintiffs produced and proved, upon the trial, a regular chain of title for the Powers farm, by devise from George Powers the elder to George Powers the younger, and by devise from the latter to Mary Powers. They also produced and read in evidence several mesne conveyances, which vested in themselves whatever title Mary Powers had to the premises in controversy, under the two devises before referred to.

By a reference to the two deeds of the 11th of May, 1787, which are the foundation of the plaintiffs' title, it will be seen that the premises conveyed are bounded easterly by the road leading from Bedford to Brooklyn ferry. Upon this description the plaintiffs do not, as the defendants' counsel supposes, claim title to the westerly half of the road bed as an incident to the grant of the adjoining land. They claim it as a part of the premises conveyed, and within the terms of the grant. The description is not such as necessarily to exclude the road or highway from the effect of the grant. No words are used indicating an intention to limit the eastern boundary to the westerly line of the road. On the contrary, the words of the grant include, by fair interpretation, the one half of the road bed which are the premises in dispute. In *Jackson* v. *Hathaway*, (15 *John.* 447,) which was an action of ejectment brought to recover certain premises in the city of Hudson, which were formerly a public highway, but had been discontinued by an order of the common council, the heir at law of the patentee was the lessor of the plaintiff. The lands upon both sides of the highway had been conveyed to those under whom the defendants claimed, and the question was whether the bed of the road passed to the grantees under the deeds, or remained in the original patentee or his heirs. Upon the production of the deeds, it appeared the premises in both conveyances were bounded on the north side and on the south side of the road. The descriptions mani-

fested a plain intention to exclude the land covered by the road from the effect of the grants. The court say, "the boundaries in these deeds do not include the space of the road, and of course the plaintiffs' title to the intervening ground remains as perfect as if no road had ever been there. The purchasers under those deeds have lost an easement which was public, not private, but they have, exclusive of the old road, all the land they bargained for." Again, it is said to be "impossible to protect the defendant on the ground that the adjoining road passed by the deeds as an incident to the lands professedly granted. A mere easement may, without express words, pass as an incident to the principal object of the grant, but it would be absurd to allow the fee of one piece of land, not mentioned in a deed, to pass as appurtenant to another distinct parcel which is expressly granted by precise and definite boundaries. The plaintiff recovered because the land claimed was not mentioned in the deed of his ancestor, and could not pass as incident to another parcel. The justice who delivered the opinion, however, declares what is regarded as the settled rule, that where lands are bounded by a public highway, or the courses in the deeds of conveyance run to a public highway, or any similar object, the premises conveyed extend, by fair construction, to the middle of the highway or object named;" for, he says, that "where a farm is bounded along a highway, or upon a highway, or running to a highway, there is reason to intend the parties meant the middle of the highway." (See 3 *Kent's Com.* 433, 434. *Starr* v. *Child*, 20 *Wend.* 149. *Sizer* v. *Devereux*, 16 *Barb.* 160.) It appears to me, therefore, that at the close of the plaintiffs' evidence the proof was sufficient to entitle them to recover, and to cast upon the defendants the burthen of showing title out of the plaintiffs.

There were two principal grounds taken to show that the plaintiffs were without title to the premises in dispute. 1st. That the common source of title to the premises claimed, and also to the adjoining premises, was the Dutch gov-

ernment, which granted a patent for the Powers farm in 1846, at which time the premises claimed were in use as a public highway. The civil law prevailed in the Netherlands and their colonies at that time, and by the rule of the civil law, the sovereign or government was the absolute owner of the soil of the public highways, and the title of the adjoining owner was absolutely divested. The defendants produced evidence tending to show that the road from Bedford to Brooklyn ferry, originally an Indian path, was in use as a highway or road for transit while the Dutch held dominion over the country. They also proved that the Powers farm was held by the ancestor of Michael Bergen, who died during the revolution, under a patent granted by William Kieft, on behalf of the Dutch government, of the date of February 22, 1646, and by a confirmatory patent from Richard Nicholls, governor general &c. under the Duke of York, of the date of June 21st, 1667. There was no proof, however, to show how, when or by whom the old road was laid out or dedicated ; whether by the government over lands of private persons taken for that purpose, or by reservations by the government from the lands patented to the original proprietors ; or by dedication of the proprietors themselves. Upon all these questions, so material to maintain the defendant's theory and first ground of defense, we are left entirely to presumption and conjecture. It is more than two hundred years since the Dutch government have ceased to exercise any power or dominion over the land, and it may be worth while to examine for a moment the effect of these various deeds and grants, and the possession of the Bergen and the Powers family under them, for so great a length of time. To go no farther back than the 11th May, 1787, the date of the two deeds to George Powers, we find that from that time, a period of more than seventy years, the Powers family and their grantees have been in the actual possession of the lands adjoining the road, under a deed of conveyance which I have shown embraced the lands to the center of the road, to which

they claimed title, subject to the public easement. They were therefore in the constructive, if not the actual, possession of the *locus in quo*. They could have maintained an action of ejectment for an exclusive appropriation of any part of the roadway, and the sheriff would have delivered them the possession, subject to the public easement. They could have maintained an action of trespass against a person removing trees, gravel or soil, or doing any tortious act other than exercising the mere right of passage. (*Goodtitle* v. v. *Acker*, 1 *Burr*. 133. *Etz* v. *Daily*, 20 *Barb*. 32. 3 *Kent's Com.* 432. *Gidney* v. *Earl*, 12 *Wend*. 98.) The mere abilty to maintain the action of trespass for an injury to lands, subject to the easement of a public highway, shows that the law regards the owner of the fee as in the actual possession. For it is an elementary principle familiar to us all, that as the gist of the action is the injury to the possession, unless at the time the injury was committed the plaintiff was in the actual possession, trespass cannot be supported. (*See the cases referred to in the notes to* 1 *Chitty's Pl.* 175.) In *Gedney* v. *Earl*, Mr. Justice Nelson says : " The right of way, public or private, is but an incorporeal hereditament, an easement which *per se* does not divest the owner of the fee of the land; and for any other purpose, except the use or servitude as a public highway, the soil belongs to him, and he is entitled to the same remedies, for an injury to his residuary interest, that he would be entitled to if it was entire and absolute. The law will not presume a grant of a greater interest or estate than is essential to the enjoyment of the public easement: the rest is parcel of the close. The fact that the highway is fenced on each side is for the convenience of the owner, and has no necessary connection with the road. It follows from the above view that the person in possession of the farm or lot through which the highway passes, is in contemplation of law in possession of the highway, subject to the public easement; for being in possession of the lot, he is *prima facie* in possession of every parcel of

it." It would be an unreasonable and an unwise conclusion to hold that these legal results from undisputed facts should be disregarded and set aside, upon the mere presumption that the Dutch government may have reserved to itself in the original patents, or obtained in some other unknown way, the title to the land embraced within the lines of the old road.

The second ground of defense consisted in showing title out of the plaintiffs and their grantors, acquired by the Brooklyn, Jamaica and Flatbush Turnpike Company, under two several acts of the legislature, which were read in evidence and referred to upon the trial. The defendants also produced and proved a deed of conveyance from the turnpike company to the Brooklyn and Jamaica Rail Road Company, bearing date August 2d, 1832, for the turnpike road, including the premises claimed by the plaintiffs, together with divers other mesne conveyances, which finally vest whatever right and title the rail road company acquired under the deed from the Brooklyn, Jamaica and Flatbush Turnpike Company in the defendants in this action. The existence of these various deeds of conveyance was not controverted upon the trial, and as the right of the defendants depends exclusively upon the question whether the turnpike company acquired the fee of the lands taken for the use of the road, or an easement and right of passage only, it will not be necessary or useful to notice them, farther.

The Brooklyn, Jamaica and Flatbush Turnpike Company was incorporated by the act of the 17th March, 1809. And by the 1st section it was declared to " be in law capable of purchasing, holding and conveying any estate, real or personal, for the use of the corporation," with the proviso that such estate " shall be necessary to fulfill the objects of the corporation, and to no other purpose whatever." The 5th section named the commissioners to lay out the road directed by the act, " subject to the directions, regulations and restrictions in all respects as are prescribed and contained in the act relative to turnpike companies, passed March 13th,

1807. The 3d section of this latter act provides that commissioners, appointed by the governor, shall lay out the road in such manner that the object of the corporation and the general interest of the public shall in the best manner be effected. It also provides for an agreement with the owners of the land for the purchase of so much thereof as shall be necessary for making the road, and for gates, toll-houses and other works. And in case of disagreement, it provides for the making of an estimate and assessment of the damages which the owners of the land used or to be used for the road may sustain, or will sustain, with a provision that the corporation shall not enter upon the lands for the purpose of making the road thereon until the damages are paid. The section also prohibited the corporation from appropriating any highways to the uses of the turnpike road, until such highway should have been appraised and paid for to the commissioners of highways of the town in the manner directed for the taking of private property. The appraisers appointed to make this appraisement filed their inquisition, dated August 1st, 1809, and thereby found the road upon which the turnpike was laid out to be a public highway, and they awarded $100 for damages to the town of Brooklyn, and $50 to the town of Flatbush, to be paid to the commissioners of highways of such towns. I see nothing in the two acts of the legislature to which I have referred, to justify or authorize the opinion that the legislature intended the turnpike corporation should acquire the title in fee to the lands needed for the construction of their road. Such a legislative intent will certainly not be implied, or inferred, from any loose or careless expressions to be found in the acts themselves. Those who seek to establish such consequences as the foundation of a title to lands, must find authority for it in the language which the legislature have used, considered in reference to the objects and purposes which the laws were designed to accomplish. This is just what the act of incorporation itself declares; for it limits the power of the corporation to the acquisition

Dunham *v.* Williams.

of such real and personal estate as shall be necessary to fulfill the objects of the corporation, and declares it shall hold real property for no other purpose whatever. The objects which were to be accomplished by the corporation was the construction of a public highway or road for public travel, to be maintained and kept in order at its own cost, and upon which it had the right to erect gates and take tolls from travelers. All the estate it needed in the lands taken for the road was the easement or right of way known to the law in the classification of property as an incorporeal hereditament. The use to which the road was to be devoted was not to be confined to the corporation and its employees, like that of a railway operated by steam. But the use was a public use, open to all who chose to enter upon it, and was in no way distinguishable from a common highway, except that it was to be constructed and maintained by the corporation, with the right to take tolls thereon. We see the same proceedings, substantially, for the opening and laying out the turnpike as are followed in laying out and opening a public highway, so far as relates to the acquiring the right of passage, and the land owners are to be compensated for the damages sustained by them for the lands used or to be used for the road. The compensation is not measured by the value of the lands, as it certainly would have been if it was intended to take the property in fee, but it is the damages which the owners sustain by the use of the lands required for the road. This shows that the framers of these statutes had in mind the easement, and not the fee of the land. And so we find that the damages awarded by the appraisers for the old road taken for the use of the turnpike, were given to the highway commissioners of the towns of Flatbush and Brooklyn, who certainly had nothing but the right of way, and not to the owners of the fee, because the fee was not taken. I am therefore of opinion that the turnpike company did not acquire, and had no authority to acquire, under their act of incorporation, any other estate in the lands taken for the road than

an incorporeal hereditament or right of passage. The rights of a turnpike corporation to lands thus acquired, were considered and passed upon by this court in the case of *Hooker* v. *Utica and Minden Turnpike Co.* (12 *Wend.* 371.) The corporation was created by an act passed March 24th, 1809, the same session at which the Brooklyn, Jamaica and Flatbush turnpike act was passed, and the provisions of the two acts are in many respects identical. The corporation was authorized, upon paying to the land owners the sums assessed and awarded to them by the appraisers, to have and hold, "to them and their successors and assigns, the lands and tenements in the inquisition described, and the company was not to enter upon the lands until the damages were paid." This language, it is to be observed, is much stronger, and would be regarded as much more effectual to vest the company with the estate in fee, than the language used in the Brooklyn, Jamaica and Flatbush act. The action was brought against the defendant for digging and tearing up a sluiceway in the road. It appeared on the part of the defense, or what was equivalent, there was an offer to prove, that the part of the road where the sluiceway was, had been abandoned by the company since 1826, (the alleged trespass having been done in 1829,) and had been fenced by the owners of the land. The evidence was rejected, and the turnpike company had a verdict, the judgment upon which was reversed upon a writ of error. Mr. Justice Nelson, who delivered the opinion of the court, saying, "The owners of the lands through which the road ran, had good cause for believing that the corporate rights of the company had been voluntarily abandoned, and the lands had reverted to the original owners. Although the act of incorporation vests in the company the title to the lands over which the road passes, on compliance by them with the provisions of the act, such title must nevertheless be considered as vested only for the purposes of a road, and when the road is abandoned, the land reverts to the original owners." This decision is in harmony with the constitutional rule as

Dunham *v.* Williams.

now understood, that the power to take private property for public use, under the law of eminent domain, excludes the idea that it may be taken for private use, or taken under the semblance of public use, and immediately or ultimately conveyed and appropriated to private uses. Very many of the numerous turnpike roads which extend over the country in all directions are gradually being abandoned, under the influence of modes of travel and transit unknown and unthought of by the framers of these statutes. And it would be an intolerable burden upon the property through which they were made, if upon their disuse and discontinuance the corporations were entitled to the rights of owners in fee, with the incidental power to sell and convey to private uses, and to exclude the owners of the adjoining lands from all rights of entry and passage over these narrow strips of territory, worthless for cultivation or agricultural purposes, and available only in connection with the adjoining lands, and which but for the road would have remained part and parcel of their own property. The only sensible rule is that asserted in the case last quoted—that where the language of the act of incorporation is such as to vest the title in the company, it must nevertheless be considered as vested only for the purposes of the road; and when the road is abandoned, the land reverts to the original owner.

Several questions were raised during the trial upon the admissibility of testimony, which, upon the view I have taken of the case, it is not material to consider.

Judgment should be entered, upon the verdict, for the plaintiffs.

[KINGS GENERAL TERM, February 10, 1862. *Emott, Brown* and *Scrugham*, Justices.]