By the Court, Co wen, J.
The counsel for the plaintiffs adverted on the argument to the evident purpose for which this lot, No. 12, with other lots, were laid out along the river, among the original proprietors. He insisted, that granting them as water-lots looked to the enjoyment of hydraulic privileges ; and it would, no doubt, be strange, that after deliberately arranging and conveying lots for such an object, the law should cut off the purchasers from the river, by a puzzledom to be raised on a few equivocal words in the grant.
But there is no necessity for looking to extrinsic circumstances. There can be no question, that the deeds to Cobb Sc Morgan, on ' their face, invested them with a fee simple in the bank of the river. The south line runs about 42 feet to the Genesee.river, thence northwardly, along the shore of the said river to Buffalo-street; and it is insisted by the counsel for the defendants, that these latter words are so strong, as to subvert the plain meaning of the former words to the river, and tie up the grant to the shore. But suppose we were to expunge the words to the river, and take the shore as the boundary : the grantees became-proprietors of the shore; which when applied to a fresh water river, means the bank. Johns. Dic. quarto. Shore and bank, signifies the earth arising on each side of the water. Id. Bank. And then, says Sir John Leach, V. C., Wright v. Howard, 1 Sim. & Stu. 203, "Prima facie, the proprietor of each bank of a stream, is the proprietor of half the land covered by the stream." The bank and the water are correlative. You cannot own one without touching the other. But the bank is the principal object; and when the law once fixes the proprietorship of that, the soil of the river follows as an incident, or rather as a part of the subject matter, usque filum aquce. Lord Hale puts it that fresh rivers do, of common right, belong to the owners of the soil adjacent. De Jure Maris, ch. 1. 6 Cowen, 537. The law does not stop to criticise the words by which a man is made owner : it enquires, Is he the shore owner 1 If that be so, he *153 touches the water. Per Marshall, C. J. in Handly's lessee v. Anthony, 5 Wheat. 385. It is conceded that the words to and along the river, would include the'stream. What difference, I ask, between that and to and along the shorel A difference of words signifying the same thing. In either case, taken literally, and according to common understanding, they carry you to a line intermediate the water and the land, and touching both. How do they take more l Upon construction of law, which does not require express words for the grant of every part, as houses, fences, mines, or the elements of water, or air, which all pass by the word land; and, as a grant of land by certain boundaries, prima facie psases all such parts to the grantee, usque ad ceelum et ad infernos: so, within the same principle, it passes the adjoining fresh water stream, usque ad filum aqua. The passing of the one kind may just as well be questioned as another, not only in the eye of the law, but of common sense and reason. Within the first maxim it is said, one shall not build so as to overhang another’s premises, darken his lights, or confine the air ; and surely it, would be more absurd for the law to give a man the shore or side of a fresh water river 3 and yet, by saving the bed to the grantor, make the owner of the land a trespasser, every time he should slake his thirst or wash Ms hands in the stream. In Gavit’s administrators v. Chambers, 3 Ohio Rep. 495, a case by which the supreme court of the state of Ohio adopted the doctrines of Lord Hale, they say,te a river consists of water, bed and banks.” By running up or down, or along either, therefore, you touch the river within this case. I have said that along the shore is the same thing. I admit it is not critically correct to say the shore of a river. The term belongs in its strict sense to the ocean. Dr. Johnson says, it applies to a river only in a secondary, or, as he calls it, a licentious sense. “ Beside the fruitful shore of muddy Nile.” Johns. Dict. 4to. Shore. Yet, it is sometimes so applied in legal proceedings. The compact between Virginia and Kentucky speaks of the shores of the Ohio ; which word shores was treated by C. J. Marshall, in Handly's lessee v. Anthony, as the same with side or bank. We know it means the same in common understanding *154 among us, which must govern in the construction of a conveyance.
It is true that parts of the thing may be excluded, or excepted from the grant, or may exist in separate hands by prescription ; or they may be granted by name together with the land ; but in no case does the mere omission to mention them operate as an exclusion. No matter how particularly the area of the land may be described ; no matter how definitely bounded, it will carry every part, whether above, below, or collateral. That this rule in respect to the soil of fresh wat^r rivers has long practically prevailed, may be seen in the books and authorities which I collated in 6 Cowen, 543 to 551. It follows, also, I think, conclusively from the cases there cited, that if there be an exception or exclusion of the part, the burthen of showing that, lies on the side of the party who affirms it. The exception is to be raised like that to the right of using a stream running across another’s farm. It may be expressly reserved for the grantor’s mill below, or there may be an adverse user of twenty years, &c. all of which is very fully considered in many cases. There is but one difference between a stream running by the side of a man’s farm and one which runs through it ; in the former case he of course owns but half, and in the latter the whole of the ground covered by the stream. In Gavitfs administrators v. Chambers, the plaintiffs had taken possession of the bed of the Sandusky river, built a mill, and sued the defendants for building below and flowing back the water upon the mill. The defendants denied that the plaintiffs owned the bed of the stream ; for they claimed under a conveyance from the United States bounding them on the bank ; and, indeed, the area of the river to high water mark was deducted by the United States, "and only lands on the shores paid for. Yet the bed of the stream was held to pass. Here was every thing but an express exception by the United States. They had included the river in their surveys ; but deducted the bed from the price and bounded the patentee on the banks. Yet what say the court'? They ask, “ at what point does the right of the owner of the adj oining lands terminate1? on the top or at the bottom *155 of the bank! at high or low water mark! does his boundary recede or advance with the water, or is it stationary at some point! and where is that point! who gains by alluvion, who loses by the direptions of the streams! No satisfactory rules can be laid down, in answer to these questions, if the common law doctrinesbe departed from ; and if it be assumed that the United States retain the fee simple in the beds of our rivers, who is to preserve them from individual trespasses, or determine matters of wrong between the trespassers themselves! It cannot be reasonably doubted that if all the beds of our rivers supposed to be navigable, and treated as such by the United States in selling the lands, are to be regarded as unappropriated territory, a door is opened for incalculable mischiefs. Intruders upon the common waste would fall into endless broils amongst themselves, and involve the owners of adjacent lands in controversies innumerable. Stones, soil, gravel, the right to fish, would all be subjects for individual scramble, necessarily leading to violence and outrage.” The picture is a strong one ; but it comes short of life, if we apply the strict construction there contended for by the defendants to the water lots of the Genesee at Rochester, and the hundreds of other streams in our manufacturing districts. It is said by Chancellor Kent, speaking of the cases cited in 6 Cowen, 544, "They demonstrate the existence of the rule that a grantee bounded on a river, (and it is almost immaterial by what mode of expression,) goes ad medium filum aquce, unless there be decided language showing a manifest intent to stop short at the water’s edge.” 3 Kent's Comm. 429,3d ed. note. We may ask, looking at the whole of the books and the honesty of the transaction, what ought the grantor, whether United States, state or individual, to do when the patent or grant extends to the shore, but the grantor yet means to except so important a part as the adjoining stream! The obvious answer is, let the grant state the exception in terms. Otherwise, as the law has long been understood, the allowance of an exception would operate as a fraud, gross in its character, and dangerous to a very large portion of the community.
*156 There, will be seen, moreover, a very distinct and strong tendency in the cases I have cited, to turn every doubt upon expressions which fix tha boundary next the river, in favor of a contact with the water. The words which in those cases and others have created the most frequent difficulties are where the termini of the river line stand on the bank at some distance from the stream, and the line is prescribed do run between them, “ along the river,” or !C up the river,” or “ down the river,” or the like. It has been contended in such cases that the call may well be satisfied by a direct line between the termini, irrespective of the immediate margin ; or by following at a distance from the margin, the meanders of the stream, where the words require that. But all such language has been held to fix the boundary upon the river. Rogers v. Mabe, 4 Dev. 194, 195, and the cases there cited. And see McCullock's lessee v. Aten, 2 Ohio R. 307, and Fleming v. Kenny, 4 J. J. Marsh. 157. These cases show, what it is very difficult for the human mind to resist, that the parties never mean to leave a narrow strip between the land and the river, merely because some stake or tree, or even all the stakes and trees of the line, stand at a slight distance from the river. The expression of an intent to run the line along the stream, reaches a distinct natural monument, which overcomes the others. They are rather intended to indicate or point down to the termini of the water line. In McCullock's lessee v. Aten, i „ J the court say, <rthe boundaries described as corners are found at a considerable distance from the water’s edge.” One of the termini was an oak tree, and the other a post; and the line • was to run between these down the creek with the several meanders thereof, 207 perches. The court say it is not unfrequent that both corner and line trees stand at a greater or less distance from the actual line. C6The nearest and most permanent trees are usually marked. A tree marked as a corner upon the bank of a stream, never can stand upon the water line at low water mark; and where the call is for the meanders of a stream, the corner is not supposed to be exactly in the line. The fact that the marked corner called for stands four rods from the water, does not *157 create any ambiguity in the terms down the creek with the several meanders thereof. They import the water’s edge, at low water, which is a decided natural boundary, and must control a call for comer trees or stakes upon the bank.” I am unable to perceive any difference between the words there used and the words in the deed to Cobb, “ along the shores of said river to Buffalo-street,” and even had both termini of this water line stood at a short distance from the river, still the shore, the immediate side of the river, would have been the conspicuous and controlling monument, within the case of McCullock's lessee v. Aten. This great anxiety to connect water with the main premises in the conveyance, and give a right of entry for its full enjoyment, runs through the whole history of the law. If it cannot give the land under water as parcel of the grant, it will save the water alone as an appurtenance. Thus in Nicholas v. Chamberlain, Cro. Jac. 121, it was held, " that if one erect a house and build a conduit thereto in another part of his land, and convey water by pipes to his house, and afterwards sell the house with the appurtenances, even though he except the land, yet the conduit and pipes pass with the house, because it is necessary, et quasi appendant thereto.”
But the grants to Cobb and Morgan were not embarrassed by any monuments, having the appearance of conflict with the lowest verge of the shore. The south line runs to the river itself, and then northwardly along its shore to the street. It is said the street terminates at the bridge, which extends out and meets the street a short distance from the river, and that the latter terminus must therefore be a like distance from the river. But there is no such fact apparent upon the case. JVon constat, but the bridge may be a continuation of the street j and probably such is the fact. That being so, it is impossible to distinguish this from the case of Jackson v. Louw, 12 Johns. R. 252, 255. There the line ran to the creek and up the same to a certain point. The court said, " the terms, and up the same7 necessarily imply that is to follow the creek according to its windings and turnings j and that must he in the middle or centre of it. The rule is well set- *158 tied, that when a creek not navigable, and which is beyond the ebb and flow of the tide, forms a boundary, the line must bo so run.” So in Fleming v. Kenney, the court said the expressions, “ beginning on the bank of the creek, thence up the creek, with its meanders, import literally, that the margin of the creek, is the boundary.” Thus, I think, we are brought clearly to the river, and are continued there. And we have seen the settled common law consequeece, the soil passed usque ad filum aquae ; and a new trial should be denied.
New trial denied.
Mr. Justice Bronson dissenting, delivered the following opinion :
Bronson, J.
Navigable rivers belong to the public. Other streams may be owned by individuals. This doctrine is foúnded on principles of public policy, so obviously just and wise, that it is no matter of astonishment to find it prevailing all over Europe, and, so far as I know, all over the civilized world. Indeed it would be strange, if any enlightened people had failed to perceive the importance of declaring all navigable waters public property.
In England a rule of evidence has been adopted, which although it recognizes the doctrine, does not always give it complete practical effect. By the common law, the flow and reflow of the tide is the criterion for determining what rivers are public. This rule is open to the double objection, that it includes some streams which are not in fact navigable, and which consequently might well be the subject of individual ownership ; and it excludes other streams which are in fact navigable, and which in every well regulated state should belong to the public.
Although the ebb and flow of the tide furnishes an imperfect standard for determining what rivers are navigable, it nevertheless approximates the truth, and may answer very well in the island of Great Brittan, for which the rule was made. But such a standard is quite wide of the mark when applied to the great fresh *159 water rivers of this continent; and would never have been thought of here, if we had not found the rule ready made to our hands. Sow, I think no doctrine better settled, than that such portions of the law of England as are not adapted to our condition form no part of the law of this state. This exception includes not only such laws as are inconsistent with the spirit of our institutions, but such as were framed with special reference to the physical condition of a country differing widely from our own. It is contrary to the spirit of the common law itself, to apply a rule founded on a particular reason, to a case, where that reason utterly fails. Cessante ratigone legis, cessat ipsa lex.
The doctrine of the common law in relation to the ownership of fresh rivers has never been distinctly acted upon in this state when the river was in fact navigable, except in a single instance, and the judgment rendered on that occasion has since been reversed for error. In The People v. Platt, 17 Johns. R. 195, the question did not arise ; for the case states, that the Saranac " is a rough, rapid, and shallow stream, with a rocky bed ;" and that “ the river is not navigable for any kind of boats or craft." In Hooker v. Cummings, 20 Johns. R. 90, the question was again discussed, though it was not necessary to the decision of the cause, and it did not appear that Salmon river was in fact navigable. In Ex parte Jennings, 6 Cowen, 518, it did not appear that the Chitteningo creek was navigable ; but the contrary may fairly be inferred from the facts of the case. The common law rule was first applied to a fresh river which was in fact navigable, though only for boats, in The Canal Commissioners v. The People, 5 Wendell, 423, 13 Wendell, 355, and 17 Wendell, 571. But the judgments of this court asserting the doctrine have been twice reversed by the court for the correction of errors.
If it were either necessary or proper for me to vindicate the judgments of the court of last resort, it could I think, be most satisfactorily established that it is now and always has been the law of this state, that navigable rivers, whether fresh or salt, and without any reference to the flow and reflow of the tide, *160 belong to the public. But it is' enough that the question has been settled by a forum from which there is no appeal.
If we can judicially notice the fact that there is no tide in the Genesee river, see Hooker v. Cummings, 20 Johns. R. 98, I know not upon what principle wé can say, without proof, that the stream is not in fact navigable. In truth it is navigable at and near its entrance into Lake Ontario j how it may be above the falls at Rochester, I am unable .to say. It is probably a sufficient objection to this action that the plaintiffs seek to recover a part of the bed of a river without showing that it is-such a stream as is subject to individual owership.. But as there may be a doubt as to where the onus lies of showing the character of the stream, I shall, not rest my opinion on this point.
Assuming that the Genesee river is not navigable in any sense of the term, and also that we have adopted in its whole extent the common law rule in relation to the ownership of fresh rivers,I still think it quite clear that the plaintiffs are not entitled to recover. The common law, as I read it, has never said that a grant of lands bounded by the shore of a stream of any description, extends beyond the specified limit, and includes other lands not embraced by the terms of the grant. Lord Chief Justice Hale, in his celebrated treatise de jure maris, lays down no such doctrine, nor do I find that it has ever been judicially asserted in Great Britan. If the rule exist at all, it is one of modern invention, and had its origin on this side of the Atlantic. It is a refinement on the common law, which is in itself sufficiently absurd when transplanted and applied to the great inland waters of this country.
What is this case 1 Nathaniel Rochester and others were seised in fee of a tract containing 100 acres of land on the west side of Genesee river, including the bed of the river to the thread of the stream. How they acquired title, the case does not state? but their seisin is admitted. Under Rochester and others the plaintiffs made title by deed to a small portion of the property. The conveyance describes the premises granted by metes anff bounds. The description, so far as it is material to the present *161 inquiry, is as follows : thence eastwardly 66 to the Genesee river j thence northwardly, along the shore of said river, to Buffalo-street.” Although, without explanation, there might be room for doubt as to the true terminating point of the line running to the river, that doubt is fully resolved by the words which immediately follow—K thence northwardly along the shore of said river.” And besides, instead of running to the bridge, as the line would if it followed the thread of the stream, it runs to the street which runs west from the bridge and bounds the premises on the north. The land enclosed by the lines given in the deed lies wholly on the west side, and does not include any portion of the river. I did not understand this to be denied on the argument. As a question of fact it is impossible to maintain, either that one party intended to grant, or that the other expected to acquire, any land lying beyond the specified boundary. There is nothing in the deed from which it can be justly inferred that the parties meant more than they said. Although the property conveyed is called a mill-seat lot, the water was to be taken from a race already constructed, and which ran near the west side of the lot. Without including any part of the bed of the river, the plaintiffs had got all the property which they purchased, and every thing necessary to its beneficial enjoyment in the way contemplated by the grant. How then have they acquired a title to the bed of the river, which is claimed in this action 1 It is said they a cquired it by virtue of the common law doctrine concerning the ownership of fresh rivers. That position, cannot I think, be maintained. Let us see how the question stands on authority.
The first branch of the doctrine, as laid down by Male and others is, that while arms of the sea, or rivers in which the tide ebbs and flows, belong to the public, fresh rivers may be the subject of private property. If the bed of a stream may be owned by individuals, then, like other real estate, it may be bought and sold, granted and conveyed. The owner may alien all that he has, or a part only.' He may sell the bed of the river either with or without other lands j and he may sell adjacent lands either with *162 or without the bed of the river. If a proposition so plain need the support of a great name, I refer to Hale. He says, " one man may have the river, and others the soil adjacent.” Harg. Law Tr. 5.
Another branch of the doctrine is, that the owner of the adjacent soiHs “prima facie” or “ in common presumption” owner of the river. If he own on both sides, the whole of the river is included—if only on one side, his right extends usque flum aquae. Harg p. 5, 6. The doctrine is not that the riparian proprietor must necessarily own the river, nor is there any rule of the common law which says that the stream will pass, by a grant of the adjacent soil, either as an incident or otherwise. The law indulges a presumption in favor of the shore owner, which will prevail in the absence of all proof to the contrary. This, like most other presumptions, may be rebutted. The language of Hale is,“but special usage may alter that common presumption, for one man may have the river and others the soil adjacent.” Now, if special usage, or prescription, which supposes a grant, will overcome the presumption, then most clearly the presumption may be rebutted by any evidence which disproves the fact of title in the shore owner. That evidence we have in this case. It was admitted on the trial that Rochester and others, under whom the plaintiffs make title, were formerly seised of a tract of land covering the premises in question.” Until the contrary is shown, the presumption of law is, that the title still remains in the original proprietors. The plaintiffs show a conveyance, but it does not include the premises in question. They were limited by their grant, as well they might be, to the shore of the river. The prima facie presumption in their favor as riparian owners, is effectually disproved and overthrown by showing the title in another.
The learned Charles Butler, in his note, 205, to Co. Litt. after paying a just compliment to Lord Hale, proceeds to re-affirm his doctrine. After adverting to the language of Hale, that “ fresh rivers of what kind soever, do of common right belong to the owners of the soil adjacent,” he remarks, that “ in all these cases *163 the presumption is in favor of him to whom the right or property is said to belong by common right; yet this does not exclude the possibility of its belonging to another. To another therefore it may belong; but, if he claims it he must prove his title to it.” He adds, that “ the intendment of the law ” is in favor of the " riparian owner, till there is proof of the contrary.” That proof was given in the case at bar. The same doctrine was recognized by Sir John Leach, V. C. in the recent case of Wright v. Howard, 1 Sim. & Stu. 190. He says, not that the shore owner is entitled to the river at all events, but “prima facie, the proprietor of each bank of a stream is the proprietor of half the land covered by the water of the stream.”
In Hatch v. Dwight, 17 Mass. R. 289, the precise point was adjudged, that the grant of land bounded by the bank of a river will not pass the bed of the stream. Parker, Ch. J. said, “ the land released is limited to the bank of the stream, which necessarily excludes the stream itself. And again— “the owner may sell the land [on the shore] without the privilege of the stream, as he will do if he bounds his grant by the bank.” This doctrine was admitted by the chancellor in The Canal Appraisers v. The People, 17 Wendell, 589, although he went further than a majority of the court in upholding the claims of the riparian owner. And Washington, J. has, I think, in Dew v. Wright 1, Peters’ C. C. R. 64, shown most satisfactorily that the common law rule concerning the ownership of fresh rivers cannot aid the plaintiffs.
There is no ground for saying that the bed of the stream is appurtenant, or that it can pass as an incident of the grant. It is not an easement. It is land. The owner conveys a part of his property with a definite boundary, and the grantee claims the right to go beyond that boundary and take another piece of land, which is probably much larger than the one described in his deed. He does not claim by force of his grant, but by the common law. That noble fabrick of human wisdom, although it exhibits here and there a blemish, has never authorized so wide a departure from the maxims of reason and common sense. In *164 Jackson v. Hathaway, 15 Johns. R. 447, Platt, J. says, " It would be absurd to'- allow the fee of one piece of land, not mentioned in the deed, to pass as appurtenant to another distinct parcel, which is expressly granted, by precise and definite boundaries.”
This court, unless in the case which has been reversed for error, has never laid down any principle which can aid the plaintiffs ; but quite the contrary. The case of Jackson v. Louw, 12 Johns. R. 252, presented a simple question upon the construction of a deed. It had nothing to do with the common law presumption in relation to the ownership of fresh rivers. The courses given by the deed ran to the creek, thence up the same. The court said that " the terms ‘ up the same,’ necessarily imply that it is to follow the creek acording to its windings and turnings, and that must be in the middle or centre of it.” But in the case at bar, the line after running to the river, does not run thence up or along the same, but “ along the shore of the said river.” No possible construction can carry this line to the centre of the stream, without doing violence to the contract of the parties. But this precise question was adjudged in Jackson v. Hathaway, before cited, which related to lands bounded by a highway. There, as well as in the case of fresh rivers, the law, in the absence of all evidence to the contrary, presumes that the owner of the adjacent soil owns also the highway—the whole of it, if his lands lie on both sides, or the half of the road, if he only own on one side. The case was a strong one for the defendant. He had purchased the land on both sides of a road, which sixteen years afterwards was discontinued ; and yet the original proprietor recovered against him in ejectment. In that case, as in this, he claimed by grant; and the question was, what has one party granted and the other acquired ? what is the true construction of the deed? There he was bounded by the side of the highway; here the party is bounded by the shore of a river. The language of the court is much to the present purpose. “ There is nothing,” says Platt, J. who delivered the opinion, “ in the deeds for the lots bounded on the sides of the old road, which denotes any intention to buy or sell any land not expressly included within the *165 courses and distances expressly defined, and it is conceded that those limits do not include the space occupied by the old road.” Again, he says,66 there are many cases of loosej vague and general description in deeds, which undoubtedly may require a different construction, and be subject to a different rule. Where a farm, is bounded along a highway, or upon a highway, or running to a highway, there is reason to intend that the parties meant the middle of the highway ¡ but, in this case, the terms of the description necessarily exclude the highway.” So in the case at bar, <c the terms of the description necessarily exclude” the river. The judge adds, 66 It is impossible to protect the defendant, on the ground that the adjoining road passed by the deeds as an .incident to the lands professedly granted. A mere easement may without express words, pass as an incident to the principal object of the grant 3 but it would be absurd to allow the fee of one piece of land3 not mentioned in the deed, to pass as appurtenant to another distinct parcel, which is expressly granted by precise and definite boundaries.” I am not aware that this case has ever been questioned, and it is a most decisive authority against the plaintiffs.
In this case, if one party had intended to grant, or the other had expected to acquire one half the bed of the stream, I cannot doubt for a moment that the deed would have contained some such language as this: thence easterwardly to the centre of the Genesee river; thence northwardly along the centre of said river, &c. But if this can be questioned, we know beyond all room for a peradventure, that when the parties said 65 along the shore.fi they did not mean along the centre of the river. There is no principle of the common law which will authorize us to disregard the intention of the parties, and extend the grant beyond the boundary upon which they have agreed.
When once it is settled, whether here or in England, that rivers of any particular description are subjects of private property, it is then not unnatural to presume that he who owns the shore or bank, owns also the bed ,qf the stream. Alienations were originally made without writing | and where they have *166 been made by deed, it must often happen that the instrument cannot be produced for the purpose of establishing boundaries. The party makes title to his manor or lands, by showing that he and those under whom he claims have held time out of mind. But from the nature of the case, he must often fail in making out a prescriptive title to the bed of a stream flowing by or through his possessions. To remedy this difficulty, the law steps in and says, that in the absence of all proof to the con- • trary, it is but a reasonable presumption that he who owns the adjacent soil is the proprietor of the stream also. The presumption concludes no one. It only asserts what is probably true, and, like all other prima facie presumptions, it falls to the ground when the fact turns out to be otherwise. This is the whole length and breadth of the common law rule which the plaintiffs have called to their aid for the purpose of enlarging their grant, and spreading it over land not included within the specified limits.
The doctrine we have been considering has nothing to do with a grant or conveyance. It is not a rule for settling the true construction of a deed. When a party presents his charter, the law makes no presumption concerning his title : he holds by force of his grant; he goes to the limit which that prescribes, and by that limit he is bounded. If there is any thing equivocal in the language of the grant the courts declare its interpretation. But if, as in this case, the parties have used plain and explicit language—if they have fixed a boundary which no man can mistake—courts have nothing to say about it. The law makes no intendment. It simply declares that the parties must abide by their contract. It is, as I think, a total misapplication of the rule of common law concerning the ownership of fresh rivers, to say that it has any thing whatever to do with the construction of a deed, or by way of fixing the boundaries of a grant. The presumption in favor of the riparian owner is only indulged in the absence of any direct evidence of his boundary; it is never used for the purpose of enlarging, qualifying or in any way affecting his written muniments of title, or the limits which they prescribe.
*167 If there is no settled doctrine of the common law which can aid the plaintiffs, I think it quite clear that they must fail • for there is neither reason nor common sense in making the deed operate upon property which' the one party did not contract to purchase, and the other party did not agree to sell. I think the defendants are entitled to judgment.
The majority of the court being, however, of a different opinion, judgment was rendered for the plaintiffs.
Judgment for plaintiffs,