# CHARLESTOWN.

CARTER *v.* C. & O. RAILWAY CO.

Submitted September 14, 1885.—Decided October 2, 1885.

(SNYDER, JUDGE, Absent.)

1. A declaration in ejectment, which describes the premises as "a certain lot of land lying in the town of Ronceverte in the county aforesaid, being the piece of land near the railroad depot in said town, upon which the defendant has erected a pump-house and appliances for the purpose of supplying its engines with water," describes the premises with such convenient certainty as to make it good on demurrer.   (p. 651.)

2. There is no doubt, that when an individual having title to lands lying on both sides of a water-course not navigable grants lands lying on one side thereof and bounded thereby, the grantee gets by such grant a moiety of the bed of the water-course, unless the grant clearly excludes such construction of it.   (p. 653.)

3. But, where a grantor having title to lands lying on both sides of a head race of a mill owned by him below the land, which he grants, conveys to a grantee by a deed lands on the opposite sides of this mill-race bounded by it, the tracts on each side of the mill-race being described by metes and bounds extending around the whole of each tract separately and not extending around both of them together as one tract, the grantee gets no part of the bed of such mill-race.   (p. 654.)

4. When a deed calls for a corner, which stands on the top of the bank of a stream not navigable, and the courses are up the line of said stream, though trees be marked or stakes planted along the top of the bank of such stream, the boundary of the tract would be the same, as if the deed had called for the water-edge of the stream at low-water mark as the boundary.   (p. 655.)

5. But if in such a deed as above described there be substituted instead of a stream not navigable the head race of a mill owned by the grantor on this race below the land granted, the boundary of the tract granted would be the top of the bank of the mill-race along the line, on which trees have been marked or stakes planted and not the water edge of the mill-race at low-water mark.   (p. 656.)

GREEN, JUDGE, furnishes the following statement of the case :

This was an action of ejectment brought by Emily C. Carter against the Chesapeake and Ohio Railroad Company in the circuit court of Greenbrier county in March, 1883, to recover the possession of the ground, on which stood a pump-house or engine-house, which had been erected by the company for supplying its engines with water.   The description of the land in the declaration was : " A certain lot of land lying in the town of Ronceverte in the county aforesaid being the piece of land near the railroad depot in said town, upon which the said defendant has erected a pump-house and appliances for the purpose of supplying its engines with water." This declaration was demurred to by the defendant, on the ground that the premises claimed were not described in this declaration with convenient certainty, so that from such description possession thereof might be determined, as required by the statute-law.   The court overruled this demurrer; and thereupon the defendant pleaded, that it is not guilty of unlawfully withholding the premises claimed by the plaintiff in her declaration and puts itself upon the country, and the

plaintiff did likewise, and issue was thereon joined. An order of survey was made and duly executed; and on November 20, 1883, the parties submitted the case to the court in lieu of a jury; and thereupon the court having heard the evidence found for the plaintiff all that portion of the land in the declaration mentioned, which lay between the top of the bank of the race to the plaintiff's mills and this mill-race, occupied by the pump-house or engine-house of the defendant, it being somewhat more than four-fifths of the ground, on which this pump or engine-house stood as shown by the map of the surveyor of the county returned to court under the order of survey, and that the plaintiff was entitled to this ground in fee. Whereupon the defendant moved the court for a new trial, which motion the court overruled and rendered judgment according to this finding of the court. To this ruling and judgment of the court the defendant excepted and took a bill of exceptions, in which all the evidence as well as the facts agreed by the parties was certified.

The matter in dispute between the parties, the evidence and facts agreed showed, was, who owned the land between the top of the bank of the mill-race leading to the plaintiff's mills and the edge of the water in this race? They both claimed a title derived from the same parties. The defendant under an agreement dated October 20, 1871, and a deed dated April 4, 1872; and the plaintiff under two deeds, one dated May 20, 1878, and the other July 15, 1881. These two last deeds taken together conveyed the whole of a large tract of land, on which was a grist and flour mill as well as a steam saw-mill, except that portion which had by the previous agreement and deed been sold to the defendant, and especially the whole of said mill-race including its banks and all the land immediately on the said race, which the last named deed declared had been excepted from the aforenamed deed to the Chesapeake and Ohio Railway Company. On the contrary the defendant claimed, that this agreement of October 20, 1871, among other things sold this strip of land between the edge of the water in the race and the top of the bank on the north side thereof, if not the land from the centre line of this mill-race, to the defendant, and that the deed of April 4, 1872, conveyed the same to the defendant. Claiming this

the defendant in April, 1880, erected a pump or engine-house for supplying water to the engines on its railroad. A little less than one-fifth of the ground, on which this engine or pump-house stood, was ground beyond the top of the bank of the mill-race, and a little more than four-fifths of the ground, on which it stood, was on the slope of the bank and between the top of the bank and the water's edge, that is, stood on ground claimed by the plaintiff. This pump-house was built down to the water's edge, the water in the race being then low; and at an ordinary stage of the water it extends into the water of the race about eighteen inches. When this pump-house was erected, there stood two trees at one corner of it and one tree at another corner close to the then edge of the water in the race.

One Weaver with the knowledge and consent of the grantor of the plaintiff at another place built an eating-house close to the top of the bank but altogether on the land, which had been admittedly sold by this grantor of the plaintiff to the Chesapeake and Ohio Railroad Company. But without the consent of the railroad company or of the grantor of the plaintiff Weaver built a small back kitchen below the top of the bank and therefore upon the ground now claimed by the plaintiff, and he still occupies this kitchen. This race lies between the town of Ronceverte and the north side of the Greenbrier river and what is known as the Big Island in this river. There had always been a gut or depression between the Big Island and the main head through which, before dams were put in the river, water would run only when the river was high and past fording; but at ordinary or low water there was a succession of pools in this gut. To make this gut available for a mill race, the owner of these lands, before the plaintiff or defendant had bought any of it, dug channels connecting the pools and dug a channel some two feet deep, where the river now flows into this race, and had frequently to dig away the gravel and other material, which would accumulate and form a bar at the head of the island and along the race, and this had still to be done to make the race available for the mills owned by plaintiff. Cecil Clay, the former owner of these lands, by his agreement with the Chesapeake and Ohio Railroad Com-

pany of date October 20, 1871, under which it claims the land in dispute between the top of the bank of the river and the edge of the water, sold to it first, fifty feet on each side of the railroad for the whole length of Clay's land; secondly, "all the lands lying within the following bounds : beginning at a point on the east side of third street west in said town as laid down on Hotchkiss's map, 145 feet north of the centre line of the railroad ; thence with the east line of third street west *to the edge of the mill-race :* thence with the north side of the mill-race and river to a point 400 feet east of the east line of seventh street east of said town; thence by certain lines not necessary to be named to the beginning; third, all the upper or Big Island, except three acres described on the lower point of the island and small part of the upper end of it.   Clay reserving a right to cultivate this island till it was put to use by the railroad company, and no interference was to be made by the railroad company with the mill and boom-race that will impede the flow of water or floating of logs.   This property was to be used by the railroad company only for depots and houses for railroad hands.   The company was to connect its main track by a track with Clay's saw-mill. This agreement was carried out with certain additions by the deed of April 4, 1872, which thus described the lands conveyed named as the second parcel in this contract :

"A tract or parcel containing by recent survey satisfactory to the parties 25 75-100 acres situate on the line of the Chesapeake and Ohio Railroad between station 763-50 and station 792-50 and adjoining the village of Ronceverte recently laid out on Clay's land."

A map showing the lands conveyed was attached as a part of the deed.   By this deed there was also granted to the Chesapeake and Ohio Railway Company the right to use the water of a small stream, which runs through Clay's land and this village of Ronceverte, to supply all buildings placed by the railway company on the land conveyed to it by that deed and for all other railroad purposes.   There were then added seven stipulations and agreements, which the railway company was to comply with as the consideration to be given for this deed.   The fifth of these stipulations was: "That the railroad would be so constructed and operated as not to inter-

fere with said Clay's mill and boom race so as to impede the
flow of water or the floating of logs." The map referred to
in this deed gives the courses and distances of the parcels of
land conveyed by the deed. The following is the description
of the parcel of land containing 25 75-100 acres as given on
this map : "Beginning at a point on the east side of third street
145 feet north of station 792-50, thence S. 26° 15′ E. 533 feet
to edge of race, thence N. 28° 45 E. 297 feet, thence N. 52 E.
187 feet;" then follow twenty other courses calling for no natural
objects, except that two of the courses are parallel with the
courses of the Chesapeake and Ohio Railroad. The part of
the island conveyed contained twenty-seven acres and lay on
the south side of this race as the above tract lay on the
north side of it. Like the description of the above tract
it contains many courses and distances but no natural objects
are called for, except one course and distance is said to be
"552 feet to the river," though consisting as it did of this is-
land with the exception of two very small portions; one at
the upper extremity of the island and the other at the lower
extremity. It was really bounded on the south side by the
Greenbrier River, and on the northern side by this mill-race or
the top of the bank of this mill-race, one or the other accord-
ing to the contention of the parties in this case. The parcel
of 25 75-100 acres of land, so far as it bordered on this mill-
race, was surveyed in this case under the order of survey ; and
the survey was commenced at a point called on the map A.,
which was proven to be the termination of the first line of the
survey, as set out in the plat, which was made a part of the
deed from Clay to the railroad company, dated April 4, 1872.
This first course was, "beginning at a point on the east side
of third street in said town 145 feet north of station 792-50
of railroad and thence S. 26° 15 E. 533 feet to edge of race."
There would seem to have been no real difficulty in locating
this point A. from these provisions in the deed to the defen-
dant. This point A was found to be just under the turn of
the top of the bank on the race side and about what would
be considered the high water-mark of the water in the race,
but was forty-two feet from the edge of the water in the race,
when this survey was made. Running the other course of
this tract, as laid down in the deed to the defendant, it was

found, that the first course from the point A., instead of running up the race on the top of its bank crossed this race just touching the sides of it on the south side and then recrossed it and terminated just on the top of the bank on the northern or main land which was thirteen feet then from the edge of the water in the race at the state it was when this survey was made. The two next courses ran along the top of this bank of this race and terminated also on the top of the bank at a point forty feet from the edge of the water as it then stood in the race. The other courses, the whole number being eight, went further from the race than the top of the bank, their utmost distance from the top of this bank judging from the map returned by the surveyor being about sixty feet. The general course of these lines however corresponded pretty well with the various turns in the race though not very accurately.

At the instance of the plaintiff the surveyor ran the courses and distances along the top of the bank of the race, which she claimed was the true boundary of the tract of 25 75–100 acres. The beginning point was the point A. on the top of this bank forty-two feet from the edge of the water in the race at its height, when this survey was made, but really at the high water mark. The top of this bank at the first station was fourteen feet from the edge of the water, at second station thirteen feet, at third station twenty-three feet, at fourth station forty feet, at fifth station eighty-five feet, at sixth station sixty-four feet, at seventh station forty-five feet; the eighth station was at the Weaver-house the kitchen of which was found to be between the top of the bank and the water in the race, while the house itself was altogether beyond the top of this bank; the ninth station was ten feet from the water's edge, the station being on the top of this bank; the tenth station was eleven and one-half feet from water's edge, the eleventh station fifteen feet, the twelfth station thirty-one feet; the thirteenth station was at a point claimed by plaintiff to have been an original corner on top of the bank, and the fourteenth station on top of bank was thirty-eight feet from water's edge. It will thus be seen that the top of the bank differed much at different points from the low water mark. This great diversity of its distances from

low-water mark was doubtless attributable to this race not having been altogether dug out but being a natural gut, through which the river ran wider in some places than in others, and which had been simply deepened and converted into a race.

In the running of this line along the top of the bank of this race it was found, that the pump or engine-house, the subject of controversy in this suit, was run through by the line between stations nine and ten. Of the ground, on which this pump or engine-house stood, three feet was beyond the top of this bank and therefore not on the land claimed by the plaintiff, while thirteen feet of it was on ground between the top of the bank and the water of the race and was therefore on the ground claimed by the plaintiff. The map filed with the deed to the defendant as well as the survey, by which the town of Ronceverte was then laid out and mapped were made by one Hotchkiss; and it was proven, that in 1872 there was a succession of stakes along the top of the bank of the race, fifty feet apart, and that there were similar stakes all over Ronceverte to indicate lines and corners of lots and streets, and that they were always called the Hotchkiss stakes; and that two of these stakes were still at the time of this trial standing on the top of the bank and on the line now claimed by the plaintiff as the boundary of this tract of 25 75–100 acres. Moreover the people of the town recognize them as land-marks of the Hotchkiss survey. These were all the facts proven in the case, which I regard as material.

*J. H. Ferguson* for plaintiff in error.

*J. W. Harris* for defendant in error.

GREEN, JUDGE:

The first enquiry in this case is : Did the court below err in overruling the demurrer to the declaration ? The only supposed defect in the declaration was, that the premises, the possession of which is claimed by the plaintiff, were not "described in the declaration with convenient certainty, so that from such description possession thereof may be delivered," as required by the Code, ch. 90, sec. 8. If the descrip-

tion had been "a certain lot of land lying in the town of Ronceverte in the county aforesaid, upon which the said defendant has erected a pump-house and appurtenances for the purpose of supplying its engines with water." Such description would have meant not merely the ground, upon which the pumphouse stood, but a lot of ground, on which this pump-house had been built, and might of course have included more ground than that, on which the pump-house stood, though if the pump-house covered the whole lot of ground, then of course it would only have meant the ground, on which the pump-house actually stood; but what is meant by the description of the premises claimed is made definite by the following explanatory words in the declaration: "being a piece of land near the railroad depot in said town, upon which the defendant has erected a pump-house." This shows with convenient certainty, that the plaintiff sought to recover not a lot of land in the usual sense of the word but "a piece of land on which stood this pump-house," the ground actually covered by this pump-house. With these explanatory words in the declaration, it seems to me, the sheriff could have no difficulty in delivering the possession of the premises which is all the certainty required in describing property in a declaration. In ejectment the court therefore did not err in this demurrer. It was certainly badly worded, so far as the overruling description of the premises claimed was concerned; yet it seems to me the property was described with convenient certainty within the meaning of our statute. It was described with much more certainty than in the case of *Hitchcock* v. *Rawson*, 14 Grat. 538, where the declaration was held fatally defective on demurrer.

The only other enquiry to be made is: Did the circuit court err in finding for the plaintiff and entering the judgment for her upon the evidence, which all appears in the record? This depends entirely upon whether the true boundary of the tract of land conveyed by the deed of April 4, 1872, to the Chesapeake and Ohio Railroad Company was bounded by the top of the bank of the race or gut, as claimed by the plaintiff, or extended, as claimed by the defendant, to either the low-water-mark of the race or to the center of the race. That it did not extend to the center of the race is to

me clear on the face of the deed and is made still clearer by
the evidence. The deed on its face conveys two tracts of land,
one on the north side of this race containing 25 75–100 acres
of land and the other containing 27 acres on the south side.
The map, which was made a part of this deed, shows, that
these two tracts of land lay immediately opposite each other.
If this tract of 25 75–100 acres extended to the center of
the race, the tract of 27 acres also extended to the center of
the race, and the two tracts bordered on each other and really
constituted but a single tract, which, as the map shows, could
readily have been laid off together and surveyed as a single
tract.   If the whole of the race was intended by the parties
to be conveyed to the Chesapeake and Ohio Railroad Com-
pany it would be impossible to assign a reason why these
two tracts, which would then have been but a single tract,
were not conveyed in this deed as a single tract, thus avoid-
ing the entirely useless setting out of the courses of the race
on both sides of it.   It is perfectly obvious, that the parties
to this deed certainly intended to leave unconveyed to the
Railroad Company this race either to its banks on one or
both sides or to the water's edge at least in low-water.   In
fact, if we look at the circumstances, which surrounded the
parties, when this deed was made, it would amount to an ab-
surdity to so construe this deed as to make it convey the whole
of this race to the Chesapeake and Ohio Railroad Company.
The grantors owned a dam across the Greenbrier above, made
to throw water into this race, and two valuable mills below
the lands conveyed by this deed situated upon this race, and
it was frequently necessary for him to dig out and remove the
filling up of this race, in order to use the mills.   Under such
circumstances we can not conceive, that he would convey
away the mill race so long as he owned the mills.   Other
evidence might be referred to, which shows beyond contro-
versy, that this was not his intention; but what I have said is
certainly sufficient to show, that he never did by this deed in-
tend to convey to the defendant the whole of the race.

The plaintiff in error cites *Camden and Karnes* v. *Creel,* 4
W. Va. p. 366, where the Court say: " There can be no
doubt where an individual having title to lands lying on both
sides of a water course grants the lands lying on one side

thereof and bounded thereby, that the grantee gets by such grant a moiety of the land of the water-course, unless the grant clearly excludes such construction of it. *Hayes* v. *Bowman*, 1 Rand. 417 ; *Mead* v. *Haynes*, 3 Rand. 33 ; *Crenshaw* v. *The Slate River Co.*, 6 Rand. 245 ; *Buckley* v. *Blackwell*, 10 Ohio R. 508 ; *Hopkins* v. *Kent*, 9 Ohio R. 13." This is unquestionably true; but this law has obviously no application to this case. The reason, upon which this law is based, is, that as the portion of the stream adjoining the grantee's land is necessary for his enjoyment of the land, and as such portion of the stream is of no value to the grantor, the owner of the land, on the opposite side of the stream, it must be presumed he intended by granting the land on one side of such stream to grant the portion of the stream adjoining the land conveyed to the grantee, and the law can fix no line between them except the middle of such stream. Cowen, judge, in *Starr* v. *Child*, 20 Wend. 153, says : "Surely it would be absurd for the law to give a man to the shore or side of a fresh-water river, and yet by saving the bed to the grantor make the owner of the land a trespasser, every time he should slake his thirst or wash his hands in the stream." But in the case of an artificial race used by the grantor in connection with his mill below the lands granted the absurdity would be, that the law held, that by granting lands on both sides of his mill-race as two separate tracts in one deed each bounded by opposite sides of the mill-race he granted the entire bed of the race to the grantee and thus the grantor would become a trespasser, if he undertook to clean out this mill-race or to deepen it, though one or the other might be absolutely necessary, in order that he might have any beneficial use of his mill situated on this race below. There can be no question therefore that the Chesapeake and Ohio Railway Company did not acquire the land to the middle of this race by this deed of April 4, 1872.

The next enquiry is : Did this tract of land of 25 75–100 acres conveyed by this deed to the defendant include the land down to the ordinary or low-water mark of this race? This much, it is insisted, was conveyed by this deed. In the first place in construing this deed we have a right to look to the wording of the contract between the parties of date of Octo-

ber 21, 1871, whereby this land was sold, and which provided
for the execution of this deed. This is a necessary deduction
from the decision in *French v. Bankhead*, 11 Grat. 36. Indeed
independent of any authority it would seem unquestionable,
as the deed was but the carrying out of the written contract
between the parties. This tract according to the words of
the contract is to run " to the edge of the mill-race thence
with the north line of the mill-race and river 400 feet, &c;"
and the map made a part of the deed describes a line as run-
ning to the " edge of the race," and thence by certain courses
and distances, which, though they do not accurately conform
to the mill-race, yet do make bends corresponding in a gen-
eral manner with the bends in the race. These courses were
obviously intended to run " with the north line of the mill-
race " as called for in the contract. If the facts set out in the
statement of this case be taken in connection with what ap-
pears on the face of the deed, do the words, " edge of the
race and running up it along its northern line " mean up the
line, which marked the edge of the water at ordinary or low
water mark, or did it mean commencing at the point on the
top of the bank of this race marked A. on the map and run-
ning along the top of the bank, where stakes were placed
originally in running off this land to make the deed? We
have been referred to a number of cases both by the counsel
for the plaintiff in error and by the counsel for the defendant
in error, in which upon various points of wordings in deeds
questions have been raised and decided, as to whether a deed
conveying land on a street or highway or on a stream carried
the boundaries of the tract to the edge of the street, highway
or stream, or to the centre of the street, highway or stream.

Many cases of this kind are cited in a note to *Salter* v.
*Jonas*, 10 Broom 469, as reported in 16 Am. R., 233, and a
number of them are relied upon by each of the counsel of
the parties in this case. But it does seem to me that these
cases and others like them really throw very little light upon
the question before us. But there are cases, from which it
may, I think, be fairly deduced, that, if the calls of a deed
were to the edge of a river, which was not navigable, and
thence with the northern line of such river the low-water
of such river would be the boundary of such tract. Thus

in *McCullock's Lessee* v. *Alton*, 2 Ohio 307, it was decided, that, when a deed calls for a corner standing on the bank of a creek, "thence down said creek with the several meanders thereof," the boundary is the water's edge at low-water mark. The court say on p. 311: "The fact, that the marked corner called for stands four rods from the water, does not create any ambiguity in the terms 'down the creek with the several meanders thereof.' They import the water-edge, at low water, which is a decided natural boundary, and must control a call for corner trees or stakes upon the bank." In *Starr* v. *Child*, 20 Wend. 156, the court assigns a very strong reason for this decision. Referring to this and other cases the court say : "These cases show, what it is very difficult for the human mind to resist, that the parties never mean to leave a narrow strip between the land and the river, merely because some stake or tree, or even all the stakes and trees of the line stand a slight distance from the river. The expression of an intent to run the line along the stream, makes a distinct natural monument, which overcomes the others. They are rather intended to indicate a point down to the *termini* of the water line."

. If therefore this race was a natural unnavigable river the fact in proof, that the stake, at which the courses upon it began, stood forty-three feet from the low water mark of the stream, would not prevent the low water mark of the stream being the boundary of this tract, though other stakes had been planted in the survey along the bank of this stream and all of them some distance from this low water mark.

It remains now to determine, whether it will be otherwise in the case before us, in which the lines are up the race on the boundary of the deed instead of lines up a natural stream, where as in this case the race is the head-race of mills of the grantor located below the land granted. It is obvious that the principle reason for running of lines not on the bank of the natural stream, as the words of the deed would seem to direct, but running them along the line of the low water mark of the stream have no application to the case of such an artificial mill-race, as I have supposed, and as exists in this case. This is, that in the case of the natural stream the parties to the deed never could have meant to leave a

narrow slip between the land granted and the river, for the obvious reason that such narrow slip could not be of any value to the grantor in the deed, while it would be very convenient to the grantee.   But this reason is utterly inapplicable to the case I have supposed or to the actual case before us.   For in this latter case this narrow slip between the top of the bank of the race and the low water mark of the race so far from being of no value to the grantor is of very great value to him, as he could not have the full enjoyment of the mills owned by him below, unless he owned this slip of land between the low water and the top of the bank.   This being the case, there is no just reason why the words of the deed should be disregarded as well as the stakes set up by the parties on the top of the bank, and the land granted be extended down to the low water mark in violation of the terms of the deed and to the injury of the grantor in the deed.

In the case before us this would be still more clearly unjustifiable, as, while this slip of ground between low-water mark and the top of the bank of the mill-race is necessary for the grantor, in order that he may conveniently clean out from time to time his mill-race and have the full command of it in high or low water for floating logs upon it to his sawmill and for all other purposes, it does not appear to have been regarded, when the deed was made, as of any importance to the grantee, the Chesapeake and Ohio Railway Company, and they could only use it to get water from the mill-race for their engines and for other purposes; and they accordingly put it to no use and took no possession of any part of this strip for some eight years after the deed was made; that the parties to this deed did not contemplate any such use of the water of the mill-race under this deed, is, it seems to me, shown by the face of the deed; for there is in the deed the following clause:

"No. 4. The said parties of the first part also grant to the said Chesapeake and Ohio Railway Company the right to use the water of a small stream which runs from the lands of said Clay through the said village of "Ronceverte," near Centre street, for all railroad purposes, including the supply of all depots, stations and other buildings or structures erected upon lots No. 2 and No. 3.   For this purpose the said

company may collect the said water at any point upon said stream into a suitable reservoir or tank from which it may be distributed in pipes for the uses of said company who, for the construction, maintenance and repair of all such reservoirs, tanks or pipes shall have the right to enter upon the lands of the said parties of the first part, and of all claiming under them. If after supplying all the wants of the railroad company, there remains any water of the said stream which may be availed of by the said parties of the first part or those claiming under them, without interference with the supply of the railroad company, the right to such use is hereby expressly reserved."

This shows that the Chesapeake and Ohio Railway Company provided in this deed for the use of the water of this run for the purposes, for which this pump or engine-house is now being used as well as for *all other railroad purposes*, and that the parties believed, that this run would furnish more than a sufficient supply of water for all such purposes. The clause in the deed " that the railroad shall be so constructed as not to interfere with said Clay's mill and boom-race, so as not to impede the flow of water or the floating of logs," it is insisted, shows, that the construction, which I have put on this deed, is not the one contemplated by the parties, when the deed was made, as under this construction this clause would have been useless. But in fact this *clause* would have been useless, even if this deed bore the construction placed upon it by the counsel for the plaintiff in error, and the land of the company extended to low-water mark. The truth is, that this clause was inserted merely from abundant caution. Probably it was thought advisable, because in constructing bridges across this race to connect the two parcels of land conveyed to the company the bridges might be so constructed as to impede the floating of logs in the race. This provision clearly shows however, that the grantor considered he had rights in this race, which with unnecessary caution he endeavored to protect. The building of the eating-house, the kitchen of which is according to my construction of this deed on the land of the plaintiff, is regarded by counsel for plaintiff in error as evincing, that the parties construed this deed differently from what I have construed it, but as the evidence

shows this kitchen was built on this strip of land without the consent of either the plaintiff or defendant deprives it of all importance.   The grantor in this deed, the evidence shows, was merely consulted about the building and location of this eating-house, in order that he might see that it did not interfere with his rights; and this he did by seeing that this eating-house was built on the land of the Chesapeake and Ohio Railway company exclusively.

For these reasons I am of opinion, that the judgment of the circuit court should be affirmed, and that the defendant in error should recover of the plaintiff in error her costs in this Court expended and thirty dollars damages.

AFFIRMED.