# CHARLESTON.

State *v.* Lillie Mounts *et al.*

(No. 6449)

Submitted October 15, 1929. Decided October 22, 1929.

*Chas. L. Estep,* for Brooke Martin and others.
*W. L. Taylor,* for appellant.

HATCHER, JUDGE:

This is a proceeding by a school commissioner.

Moses Mounts died in 1904 owning a tract of 225 acres in Logan county. His heirs instituted a partiton suit, in which this tract was partitioned in 1905. One of the exterior boundaries of the tract was the Trace Fork of Island Creek. The portion bordering on- the stream was divided into seven lots, numbered 1, 2, 3, 4, 5, 6 and 9. (See copy of partition map.) This litigation grows out of the fact that the courses and the distances in the descriptions of the lots do not coincide with the meanders of the creek, and do not extend entirely to the bank of the creek. It is the contention of the state that the lot lines should be run according to course and distance; that when so done there is a strip of land between the lots and the creek; and that this strip has been off the land books since 1905, and is forfeited to the state for the non-payment of taxes. The heirs of Mounts concur in the contention of the state and ask the right to redeem the strip. Lot No. 9 is the only one involved on this appeal. It was allotted to Brookie Martin, a daughter of Mounts, who conveyed it to Mrs. H. C. Jones in 1906. She and her estate have owned and paid the taxes on it since that time. The lot is described as follows: Beginning at a point on the railroad right of way with same N. 77½° W. 379 feet to corner of lot No. 6, and with same S. 14° E. 186 feet to a stake on the bank of the Trace Fork of Island Creek; N. 82° 50′ E. 215 feet; N. 51° E. 199 feet to the beginning, containing 34,848 square feet. The executor of the Jones estate takes the position that there is no vacant land between lot 9 and the creek.

As Island Creek is a non-navigable stream, a call for the bank would ordinarily extend *ad filum aquae*. *Carter* v. *Ry. Co.*, 26 W. Va. 644. In recognition of this rule the circuit court fixed the corner of the line between lots 6 and 9 at the thread of the stream, and decreed that the exterior lines of lot 9 should follow the stream 215 feet and from thence go N. 24° 57′ E. 203.5 feet to the beginning. The beginning corner (the point on the right of way 279 feet from the corner of lot 6) is "about 120 feet" from the center of the creek. Consequently, the decree leaves between the closing line of

lot 9 and the creek, a quadrangular strip which the court held was excluded from the partition and is forfeited to the state.

The language used in describing the creek lines of the other six lots is as follows:

No. 1. "To a stake at Mud Fork of Island Creek and down same with the meanders thereof." (Here follows five calls for magnetic course and distance to corner of lot No. 2.)

No. 2. "To a stake on the bank of the Trace Fork of Island Creek, S. 68° 4′ W. 206.6 feet to the place of beginning (corner of lot No. 1).

No. 3. "To a stake on the bank of Island Creek, thence up the creek N. 68° 4′ E. 185.3 feet to corner of lot No. 4."

No. 4. "To a stake on the bank of Island Creek N. 68° 4′ E. 206.5 feet to corner of lot No. 5."

No. 5. "To a stake on the bank of Island Creek, thence down the creek N. 68° 4′ E. 158 feet, N. 78° 1′ E. 14 feet to corner of lot No. 6."

No. 6. "To a stake on the bank of the creek, thence down creek binding thereon 362 feet to the place of beginning" (a stake on the creek bank).

As the partition of land is one transaction, the description of the subdivisions "should be construed together". *Mitchell* v. *Smith,* 67 Me. 338, 342-3. A comparison of the above calls shows that the commissioners had no set form of description for the exterior lot lines. Yet the creek as an exterior line of the original tract was boundary common to all the lots. The intention to run with the creek is specifically expressed as to lots 1 and 6. It may be inferred from the language of lots 3 and 5. *Carter* v. *Ry. Co., supra; Rogers* v. *Mabe,* 15 N. C. 180, 194. Positive direction is lacking as to lots 2, 4 and 9. No reason appears why the commissioners should define the lots differently in their relation to the creek. As some of the lots are designated to follow the meanders of the creek, the other lots should follow its courses also. Lot 1 as platted, shows more territory between its lines and the creek than appears between the lines of any other lot and the creek. Yet that lot expressly follows the meanders of the creek. Therefore, the fact that the lines of lot 9 do not call for the creek and are not delineated on the map as coincident with the

creek is of no probative value. The calls and the plat simply represent the lines run by the surveyor on the ground. He, of course, did not establish his corners in the creek or attempt to run all the lines of its tortuous course. His lines merely indicate the general direction taken by the creek.

A surviving commissioner, who surveyed the tract and made the partition map, testified that the strip between the lines and the creek was not included in the partition. He produced his field notes of the survey, which accord with the courses and distances given in the lot descriptions. But monuments mentioned in a description of land are given precedence over field notes. *Hubbard* v. *Dusy*, 80 Cal. 281. The bank of the creek is a natural monument. It is called for in every lot description. Therefore the field notes must yield to the calls for the creek bank. Moreover, the commissioners had been directed by the court to partition all the land capable of division; they had taken an oath to perform their duty; this land was susceptible of apportionment; the report of the commissioners makes no reference to any strip omitted from allotment, but treats the tract as entirely partitioned; and the report was accepted by the court as a complete partition. Under these circumstances and after the lapse of more than twenty years, the commissioner will not be heard to say that he did not perform his sworn duty, and to contradict by oral testimony his written report.

As early as 1838 the New York court, after reviewing the decisions, said: ''These cases show, what it is very difficult for the human mind to resist, that the parties never meant to leave a narrow strip between the land and the river, merely because some stake or tree or even all the stakes and trees of the line stand at a slight distance from the river. * * * They are rather intended to indicate or point down to the termini of the water line.'' *Starr* v. *Child*, 20 Wend. 149, 156. It is now an established presumption of law that the grantor of an entire tract does not intend to withhold a narrow strip along an outside line. See *Western Co.* v. *Peytona Co.*, 8 W. Va. 406, 418; *Clayton* v. *County Court*, 58 W. Va. 253, 260; *Colliery Co.* v. *Campbell*, 72 W. Va. 449; *Ahner* v. *Young*, 84 W. Va. 336; *Gas Co.* v. *Townsend*, 104 W. Va. 279,

282. It is always possible, of course, that a private grantor, for his own purposes, may omit intentionally such a strip from the conveyance. But in a partition proceeding where the express purpose is to dispose of all the land therein, it is not conceivable that disinterested commissioners would intentionally make such an omission. The failure of the commissioners to report the strip as not partitioned or to designate it for any particular use with reference to the lots; the entire lack of uniformity in the width of the strip; the absence of any reference to the strip in all the lot descriptions; and the calls in the lots for corners on the bank of the creek, show conclusively that the commissioners had no thought of establishing a strip between the lots and the creek; and bring this case clearly within the above presumption. Counsel for Mrs. Martin et al. does not controvert the presumption, but would limit its application to a case in which the intention of the grantor to convey beyond the particular calls of the instrument is gathered from a general description of the boundary granted. He says that there is no general description in the partition decree, from which the confines of lot 9 can be extended beyond its particular description. Intention, however, may appear in other ways than in the description of property. Here, intention is demonstrated by the very character of the proceeding, as well as by the decrees of the court and the report and map of the commissioners. That intention was to so dispose of the entire tract that its subdivisions should thereafter be held in severalty and not in common.

Every exterior corner of the entire seven lots is designated as on the creek bank except the beginning corner of lot 9. Since the creek flows by lot 9, just as by the other lots, no valid reason appears why this corner should not have been designated as the other thirteen exterior corners. The failure to describe it as on the bank of the creek must be treated as an oversight. It is clear from the partition map that the commissioners did not intend to fix the beginning corner of lot 9 at 120 feet from the creek. It is true that the creek was not surveyed and was only "sketched in" on the plat. But the author of the plat says that the relation of the creek to

the lot lines as shown on the plat is approximately correct. In the case of *Colliery Co.* v. *Campbell, supra,* the commissioner's deed called for certain trees, as an exterior corner, which were well within the boundary being partitioned. But it was held that the call "was plainly contradictory of the general purpose and intent of the conveyance"; and the line was extended to and the corner fixed on the exterior line of the tract. Under the express authority of that decision and under the general authority of the presumption of law above referred to, we hold that the description of the beginning corner of lot 9, which is given in the commissioner's report is contradictory of the purpose of the partition proceedings, and is a mistake; and that the corner is at the place where the thread of Island Creek meets the right of way. Under this view the quadrangle which the lower court held to be forfeited is within lot 9 and is not subject to amercement by the state.

The decree of the circuit court is accordingly reversed, and the bill is dismissed so far as it relates to lot 9.

*Reversed and dismissed.*